(C. D. 708)

WINOGRAD BROS., INC. *v.* UNITED STATES

United States Customs Court, First Division

(Decided November 25, 1942)

*Barnes, Richardson & Colburn* (*Albert McC. Barnes, Jr., Samuel M. Richardson,* and *Hadley S. King* of counsel) for the plaintiff.

*Paul P. Rao,* Assistant Attorney General (*James F. Donnelly* and *Frank X. O'Donnell, Jr.,* special attorneys), for the defendant.

Before TILSON, KINCHELOE, and WALKER, Judges; WALKER, J., dissenting

TILSON, Judge: This suit was filed by the plaintiff seeking to recover a certain sum of money alleged to have been illegally exacted as customs duties upon an importation of certain goatskins from China. Duty was levied upon the said skins at the rate of 25 per centum ad valorem under paragraph 1519 (a) of the act of 1930. The plaintiff claims the merchandise to be free of duty under paragraph 1681 of the same act. Alternative claims are made that the merchandise is properly dutiable at 10 per centum or 20 per centum ad valorem under paragraph 1558 of said act.

The respective paragraphs involved in this suit are as follows:

PAR. 1519 (a). Dressed furs and dressed fur skins (except silver or black fox) * * * 25 per centum ad valorem; * * *.

PAR. 1681.   Furs and fur skins, not specially provided for, undressed.

PAR. 1558.   That there shall be levied, collected, and paid on the importation of all raw or unmanufactured articles not enumerated or provided for, a duty of 10 per centum ad valorem, and on all articles manufactured, in whole or in part, not specially provided for, a duty of 20 per centum ad valorem.

The provision "Dressed furs and dressed fur skins" is a specific enumeration.   Likewise the provision for "Furs and fur skins * * * undressed" is a specific enumeration.   Certainly "Dressed furs and dressed fur skins" and "Furs and fur skins, * * * undressed" are more specific than either the provision for "raw or unmanufactured articles," or "articles manufactured, in whole or in part."   There is, therefore, no place for the application of either provision of paragraph 1558 to the merchandise involved in this case, and we need give no further consideration to the provisions of said paragraph.

The question presented for our determination is whether the involved goatskins, in their imported condition, are dressed, or undressed.

While there appears to be no question but that the imported skins are furs or fur skins, in order that this may be made entirely clear, we quote the following from United States v. Bernstein, 19 C. C. P. A. 59, where, after quoting from Transport Co. v. United States, 15 Ct. Cust. Appls. 89, the court said:

While it is true that the classification of kid skins was there in issue and not dogskins as in the case at bar, it is clear that the construction given in said Transport Co. case of paragraph 1420 applies to dogskins equally with goatskins.   If plates and mats of goatskins are manufactures of fur, as this court said they were by reason of the language of the paragraph, then plates and mats of dogskins are also manufactures of fur, and if they are manufactures of fur it must follow that the skins from which they are made are fur skins.   [Italics ours.]

At the beginning of the trial counsel for the plaintiff, for the benefit of the court and opposing counsel, made a brief statement of the issue to be presented, and gave a short résumé of the proof he expected to offer.   When the plaintiff rested, counsel for the defendant made a like statement.   Such statements as were made in this case, no concessions or admissions being contained therein, we have never considered as being material to the decision of a case, and shall, therefore, not embody the same, or any part thereof, in this opinion, or make any further reference thereto.

Since in considering the classification of the goatskins herein, they must be dealt with in the condition in which imported (U. S. v. Citroen, 223 U. S. 407; Dwight v. Merritt, 140 U. S. 213), we shall first consider the evidence concerning the process to which they were subjected in China prior to importation.   Concerning such process two witnesses testified for the plaintiff and one for the defendant. In view of the fact that the testimony of the three witnesses concerning said process is basically the same, we shall give only the process as

testified to by witness Goorevich. While it is true that the process detailed by witness Nicholson is somewhat more elaborate than the process described by the other witnesses, yet, as heretofore stated, this process, as described by the three witnesses, is basically the same. (The process detailed by witness Goorevich is used here rather than that detailed by witness Nicholson because of his greater experience and familiarity with the same.)

Witness Goorevich testified he was born in Harbin, Manchuria, of Russian parentage, and lived in China all of his life until 1939; that from 1926 to 1931 he bought and sold, in China on his own account, 15,000 or 20,000 goatskins per year, and from 1935 to 1938 he bought and sold about 30,000 goatskins, including goatskins in the condition of collective exhibits 1–A and 1–B; that during 1931 and 1932 he had his own plant in Suanhwafu, during which time he processed between 20,000 and 25,000 goatskins.

As operator of his own plant this witness was in a position to know and did know what the process was to which these goatskins were subjected. This witness testified that between 1929 and 1939 he had purchased about 120,000 goatskins, and had seen approximately a half million more. He described the process to which these goatskins were subjected in China substantially as follows:

When the bales of skins were received they were opened up and the skins dried in the sun; they are then put in a pool of fresh cold water, where they are soaked until they become soft, three or four, and sometimes eight hours. They are then washed in this water, after which they are taken out and scraped, the skins are "fleshed." Fleshing consists in taking off the fat, meat, dirt, and blood. After this they are placed in an earthenware kong holding 30 or 35 gallons of water, to which has been added about 20 pounds of dirty sea salt, and to this was added about 40 pounds of Gaolin flour, being made from seed the same or similar to those in evidence in *Brachman* v. *United States*, C. D. 389 and in *United States* v. *Rotberg*, 24 C. C. P. A. 441. The water, salt and flour are then mixed up together and about forty five of the fleshed skins are placed in each kong, where they remain for six or seven days, at the end of which time they are lifted up and turned over, and then remain for another three or four days; they are then taken from the kongs and placed in the sun to dry; after they are dry they are dampened with water blown from the mouth, then scraped with an iron and beaten for fifteen or twenty minutes with a bamboo stick to remove part of the flour. They are then packed in bales of 100 skins and are ready for shipment.

On direct examination this witness several times referred to the place where these goatskins were subjected to this processing as a tannery, and on cross-examination he frankly testified as follows:

X Q. Now, isn't it a fact, too, that these places where these skins are prepared are called tanneries?—A. Yes.

X Q. Or dressing plants?—A. Tanneries.

X Q. When you bought raw goatskins, didn't you tell your Chinese foreman to tan them?—A. Yes, sir.

X Q. And when they were tanned were they in this condition, of Exhibit 1?—A. After tanning——.

X Q. When the foreman got finished with the process?—A. Yes.

Referring to the "tanning" set out above, the witness testified that "It is Chinese tanning." The witness also stated there were about 100 tanneries in Suanhwafu, all of which he had visited and in all of which he had witnessed or observed the processing of goatskins. He further testified that Suanhwafu and Chin Chow were the principal processing centers for goatskins during his experience, which covered the period from 1929 to 1939. This testimony is nowhere contradicted by any one. This witness further testified that there were no processing plants in Tientsin for goatskins, that he had been in the processing plants in that city and that no goatskins were being processed there between 1935 and 1938.

It is worthy of note in passing that witness Nicholson did not visit a single plant and observe the processing of goatskins in Suanhwafu or Chin Chow, which the uncontradicted evidence shows were the principal locations in China where such processing was carried on.

Marcus Silverberg, who testified for the plaintiff as to these Chinese processes, was equally qualified with witness Goorevich.

We shall next consider the testimony by importers of goatskins offered by both sides. Meyer S. Workman, testifying for the plaintiff, stated that he had been a member of a firm of fur-skin importers, including the buying and selling of goatskins, for a period of about 30 years; that during the period from 1929 to 1939 his firm had imported about 75,000 to 80,000 goatskins like collective exhibit 1–B; that he had sold such skins to manufacturers in New York City for use in making fur collars and cuffs and that when sold to such manufacturers "The manufacturer leaves the goods in my store, and leaves me an order, either written or by word of mouth, that I should deliver them to this dresser and dyer whom he wants to give them to." On cross-examination this witness testified that the people to whom he sent these skins for his customers were dressers and dyers because "That is the way the trade knows them to be, that is the way I know them today;. * * *. What other people call them; * * *. That is what the trade calls them."

Nathan Berlin, testifying for the defendant, stated that he was in the importing business and had handled goatskins similar to collective exhibit 1-B to the extent of about 5,000 per year during the years 1936 and 1937; that in selling these skins to the manufacturers he sold them as "dressed skins." On cross-examination this witness admitted that in selling these goatskins as "dressed skins" he sold them as "China dressed," and that he had no practical knowledge of the dressing or dyeing of skins.

Joseph Ullmann testified for the defendant that he was "engaged in the selling of raw furs"; that he was familiar with merchandise like collective exhibits 1-A and 1-B, having imported the same from China and London for 25 or 30 years to the extent of about 4,000 or 5,000

skins from 1930 to date which he had sold to a manufacturer in New York and sent them out to the firm he was instructed to send them to and that he sold these skins as "dressed Chinese goats." On cross-examination this witness testified as follows:

X Q. Did you ever use Chinese goatskins like Exhibit 1 in the condition in which they were imported?—A. No, I never used them.

X Q. Do you know of any manufacturer that ever used them just as they came in from China?—A. I do not.

\*    \*    \*    .\*    \*    \*    \*

X Q. Do you know of any instance in which a manufacturer to whom you sold your China dressed goatskins used them in the condition in which you imported them?—A. I do not.

J. Henry Blestein testified for the defendant and since his testimony is substantially the same as that of the previous witness we shall not detail the same here.

We shall next consider the testimony offered by both sides from the fur manufacturers. Morris Kass, testifying for the plaintiff, stated that he had been in the fur manufacturing business for 27 years in New York, during which time he had purchased 30,000 or 40,000 goatskins like collective exhibit 1-A or 1-B; that after he purchased these goatskins he sent them out to dressers and dyers to be cleaned or dyed or colored; that in the condition in which he bought these goatskins they were undressed, and when he received them back from the dressers and dyers they were dressed; that when he sent such skins to the dresser and dyer he told them first of all to clean them out so that the smell is not there, to clean the dandruff off of the skins, and then dye them into the color he wanted, "We tell them to improve the leather and the hair too, as the leather comes in we could not use it; it is too hard."

This witness furt.er testified that, in determining whether he could use these goatskins in the condition in which imported, he wet them and the smell was unbearable, "After we let them dry they were too hard, like a board," but after they came back from the dresser and dyer they did nothing whatsoever to them except make them into articles.

The cross-examination of this witness was devoted almost exclusively to a conversation previously had between this witness, Government counsel Mr. Donnelly, and Mr. Henry Norman in the presence of Mr. L. H. Isacoff. Just what the conditions and circumstances were under which this conversation was had, the record is entirely silent. There is nothing in the record that even remotely suggests that this witness was, at the time of said conversation, under oath. Many of the statements which counsel for the Government suggested to the witness that he made during that conversation were categorically denied by the witness, and other statements not denied were explained

by the witness. In view of the fact that not one of the other three persons present during this conversation, two of whom were admittedly in the court room at the time, took the stand to controvert the denials and explanations made by this witness, such denials and explanations stand unimpeached. If such denials and explanations as this witness made were not in fact true and correct, and if this cross-examination were being relied upon to discredit the testimony of the witness on direct examination, then it must be admitted that the means of making this cross-examination effective was not more completely in the hands of any one than Government counsel, and yet, as heretofore stated, neither Government counsel nor the other two present at this conversation opened his mouth to controvert the denials and explanations made by the witness. In all such cases the weight to be given such testimony is a matter to be determined by the trial court.

Abraham Goodman next testified for the plaintiff that he was in the fur manufacturing business and had been for the previous 9 years; that he had bought and used in his business for the past 9 years goatskins like collective exhibit 1–B; that he could not use the skins in the condition of collective exhibit 1–B, but that he first had to send them to certain processors, and when he received them back they were ready for use in his business. "These skins were very dirty, and the leather was very hard, and it was impossible to make a pliable garment for use as a collar in that condition, and something has to be done to soften the leather, besides dyeing the various shades I wanted."

On cross-examination this witness admitted that "I gave these skins out to this concern, and they treated these skins. What was done there I don't know. I know that they came back pliable and workable. I cannot use the skins in this condition," referring to collective exhibit 1–B. Upon direction of the court this witness produced six bills covering work performed upon these goatskins. The witness stated these bills were representative and they were received in evidence as exhibit 10. According to each of these bills the charge made was for dyeing a specified number of goatskins a certain color.

Although this witness stated that collective exhibit 1–B was undressed, he was unable to say what was done to his skins by the concerns which processed them. He stated without contradiction however that he could not use goatskins in the condition of collective exhibit 1–B because it was impossible to make a pliable garment in that condition, but when he received them back from the dressers and dyers they were ready for use in his business.

Robert Workman also testified for the plaintiff that he was a manufacturing furrier for 18 years and that he handled goatskins similar to collective exhibit 1–B from 1929 to 1939, but that he did not use them in the condition in which he bought them, like collective

exhibit 1–B, but first sent them to fur processors "To be made into a presentable and workable condition, so that we could cut them up, and manufacture them and sell them to our trade." He further testified that exhibit 8 was in a fit condition to be used in his business in the manufacturing of fur wearing apparel, and when he received these furs back from the dressers and dyers they were in a condition similar to exhibit 8. The cross-examination of this witness contains nothing material to this case.

Rubin Kigner was the first manufacturing furrier to testify for the defendant. He stated that he had been a manufacturing furrier for 25 years, during which time he had bought skins in the same condition as collective exhibits 1–A and 1–B from importers; that from 1929 or 1930 to 1939 he had bought approximately 40,000 or 50,000 Chinese goatskins like collective exhibits 1–A or 1–B. All of the goatskins purchased and used by this witness were sent to a fur dresser or dyer or processor, and after they came back they were cut up and made into collars. This witness also admitted on direct examination that when he sent goatskins to Central Dyeing or Haack he did not remember what he was billed for.

On cross-examination he admitted he was not a dresser or dyer of furs. Although this witness stated on direct examination that he sent these goatskins to Central Fur Dyeing and to Haack & Co., he testified on cross-examination that Haack & Co. was not a dyer, and almost in the same breath he stated that "we never gave them to a dresser, only to a dyer." He stated that exhibit 8 was a dressed skin, and that when he sent them out, that is the way he got them back from Central Fur Dyeing Co. and Haack & Co. Although this witness attempted to testify that he had used skins in the condition of collective exhibits 1–A and 1–B, he finally admitted that he had never in his life sent out from his factory an article made out of a skin like collective exhibits 1–A or 1–B, without having something done to it. He also admitted that he did not know what the dressers and dyers did to these skins after they received them from him.

This witness also testified that he had his receipts issued by the dressers and dyers for the work they had done on these skins from 1933 down to date. Upon motion of counsel for the plaintiff, the court directed him to produce such receipts. When he returned to the witness stand to give further testimony, he was asked if he had such record and answered: "No, I have not. After I left the court, about four or five weeks ago, there was a fiscal year ended, and we threw out all our bills and receipts. * * *. We took and put them all together and put them in boxes, and gave them to the dirt man."

Solomon Meshel testified next for the defendant. He stated he was a manufacturing furrier and that in 1929, 1930, and 1931 he purchased a total of between 60,000 and 75,000 goatskins like collective exhibits

1–A and 1–B as "Chinese dressed goatskins," and sent them to certain firms with instructions to dye them, and after they were returned he manufactured them into collars and cuffs. He admitted, however, that he did not know what these processors actually did to the goatskins.

On cross-examination this witness stated that he considered exhibit 8 and collective exhibits 1–A and 1–B all to be dressed goatskins. Upon being asked if he could use a skin like collective exhibit 1–A or 1–B in the condition it comes from the importer, he answered that "it is a question." Upon being pressed he stated that he manufactured "quite a few thousand" collars and cuffs in 1929, 1930, and 1931 as he bought them from the importer, without doing anything at all to them, and sold them to Horowitz Brothers. A bill and receipt received by this witness on June 28, 1937 were received in evidence as exhibit 19.

Sol Tarkoff, testifying in rebuttal for the plaintiff, stated that he had been engaged in the cloak and suit business for the past 20 years; that from 1925 to 1936 he was employed by Horowitz Brothers as a fur buyer and that he knew Sol Meshel, of Katcher & Meshel, and during said time had purchased about 150,000 goatskin collars. He further testified in part as follows:

Q. Mr. Tarkoff, Sol Meshel of that firm, testified in this case at page 312, in answer to a cross question, reading, with its context,

Have you any samples of such a collar?—A. I haven't got any here.
Q. Did you do that in 1929 and 1930?—A. Yes, sir.
Q. Made them out of that stuff without doing anything to them?—A. Yes, sir.

\*    \*    \*    \*    \*    \*    \*

X Q. Referring to the collars which you made in 1930, and in 1929 and 1930, out of skins in the condition of exhibit 1, without having done anything to them at all. Will you tell me to whom you sold them?—A. Horowitz Brothers.
X Q. Where were they located at that time?—A. 250 or 260 West 39th Street.
Q. Showing you exhibit 1, I ask you if you purchased any collars or trimmings for wearing apparel, or for any other purpose, from Mr. Meshel or his firm in the condition of exhibit 1?—A. Never, no. I didn't buy them from Meshel.
Q. Were you the only buyer of Horowitz Brothers at that time?—A. All the time.
Q. And did you buy all of the goatskins which they used at that time?—A. I was the only one that went out to buy, and I was the only one to select them, and receive them and place them.
Q. Were you the only one that bought goatskin collars or cuffs or trimmings during that time?—A. I was the only one during those eleven years.

\*    \*    \*    \*    \*    \*    \*

The above testimony of witness Tarkoff stands without the slightest contradiction.

Bernard R. Greenberg, a fur manufacturer, testified for the defendant to substantially the same facts as witness Meshel, except that he admitted that the goatskins which he testified he manufactured into articles in the condition in which they came from China, were mixed in with articles made from goatskins that had been processed, and all sold together, for the purpose of saving 60 cents per skin.

Louis Hochbaum, testifying for the defendant, stated that he had been a fur manufacturer for 12 years, and as such had purchased between 50,000 and 100,000 goatskins like collective exhibits 1–A and 1–B from 1934 to 1939, manufactured them into trimmings and collars and sold them to the cloak and suit trade. On cross-examination this witness testified without hesitation, referring to goatskins like collective exhibits 1–A and 1–B, that: "As they come in I could not use them, because they had powder in them and they smelled bad. I myself did not use them, but I used to give them out to the dyers, and they used to drum them and *purify them.*"

Samuel Meshel testified for the defendant, and the substance of his testimony is that he was a fur manufacturer and during the years 1935, 1936, and 1937 he had purchased approximately 50,000 or 60,000 goatskins like collective exhibits 1–A and 1–B which he manufactured into collars. He further testified that he could not use goatskins like collective exhibits 1–A and 1–B in their imported condition.

We shall next consider the testimony offered by both sides as given by witnesses experienced in the dyeing and dressing of furs in the United States. For the plaintiff, Emil Olson testified that he was a practical fur dyer and dresser, having been engaged in that business for about 45 years, and that during the years 1929 to 1939 the firms with which he was connected had processed goatskins like collective exhibits 1–A and 1–B. The witness detailed the process to which he subjected goatskins like collective exhibits 1–A and 1–B substantially as follows: They are first caged and then washed in sal soda and water to thoroughly wash out the Chinese material and the dust in the hair which cleanses the skins, the fur and the leather and everything; they are put in the paddle which washes them and stirs them from ½ to ¾ of an hour; "The water overflows and the dirt and everything flows out into the sewer;" they are then put into an extractor, a centrifugal machine, which extracts all the water; some of the skins then get mordants and some do not, depending on the color desired; they are then put in a bath containing dye and tanning material; "It is an Ursol bath;" the base of this bath is alum and salt and other ingredients, which is more or less a secret; peroxide of hydrogen is also added to hold the dyes fast; they are left in this bath anywhere from ½ to 2 hours, depending on the color desired, after which they are again extracted and hung up and dried; they are then drummed with dry sawdust; they are then finished, ironed, and beaten to take more of the dust out, open up the hair and make them more fluffy.

The witness further testified that when goatskins like collective exhibits 1–A and 1–B are dyed black an aniline dye is used and in dyeing gray a vegetable dye was used into which was placed sumac,

nutgall, tannic acid, logwood, and fustic. The witness stated that in 1929 he dyed 50,000 to 100,000 goatskins with a brush, in the hair, without putting them in any kind of a wash, and before the season was over they got plenty of complaints; "The coat man that received the collars, they got the coats back, and they didn't want to have anything to do with the skins." As a result of this experiment they went back to their original process the following year. He also stated that he considered exhibit 8 a dressed Chinese goatskin and collective exhibits 1–A and 1–B undressed Chinese goatskins.

In connection with the above testimony we wish to refer to that given by Max J. Weinstein, who testified for the defendant. He stated that he shared in the profits of the firm of Weinstein & Olson from 1929 to 1932; that during said period they received and dyed goatskins similar in all physical respects to collective exhibit 1–B; that such skins were first treated to a sal soda bath, then the excess moisture was extracted and they were entered into the dye bath consisting of different aniline dyes and that only peroxide was used with these aniline dyes. However, on cross-examination he admitted that he had forgotten to state that he put salt water in the dye bath; that he had forgotten to state that he used vegetable dyes, wood dyes; that he had forgotten to state that he used nutgall and vegetable dye blue and besides nutgall he also used tannic acid and iron sulphate. He also forgot to state on direct examination that these skins were caged and stretched. He admitted however that he thought the process through which they put these skins improved the pelt.

We might observe in passing that the remarkable forgetfulness of this witness would appear to render his testimony absolutely valueless in contradicting the testimony of any other witness, and particularly that of witness Olson.

Irving Becher testified for the plaintiff substantially as follows: That he had been engaged in dressing and dyeing furs and fur skins of all kinds, including goatskins like those here in issue, since 1913; that the process used by him in dressing such goatskins was first to soak them in a solution of washing soda to get the dust and rice flour out, then they were "put in alum-salt overnight"; the next morning they were wrung out and certain oils were poured on them; then they were dried, drummed, and sent to the dyer. In 1929 the witness stated he subjected to the above process 15,000 or 20,000 goatskins like those here in issue, and this process had nothing to do with giving them color. "The dressing did not put on the color, but was to make the leather pliable, and soft, so that you would be able to work it out into a garment, or anything else; otherwise, when you dried it, the skin dried hard, and you can't do anything with it."

Referring to the Federal Fur Dyeing Corporation, the witness stated that "We were one of the largest concerns in the dressing and dyeing

industry." Based upon his 28 years of experience as a dresser and dyer, he stated that collective exhibit 1–B was undressed.

Judge KINCHELOE. You say 1929—skins like Exhibit 1–B. Did you speak of skins of that character, about that process?

The WITNESS. Yes, sir.

Judge KINCHELOE. Why?

The WITNESS. Because we tried to dye them, and after drying out it was stiff, and the manufacturers could not use them. It would stiffen the leather and harden the leather, and the manufacturers could not use them.

Judge KINCHELOE. You used this same process you say in the preparation of all Chinese goat skins like Exhibit 1, before you dyed them?

The WITNESS. Yes, sir.

After testifying that the Federal Fur Dyeing Corporation was one of the largest companies in the dressing and dyeing industry, he stated that in billing people for operations on Chinese goatskins he thought "the general practice is for it being billed as dyed goats."

Fritz Emrich testified for the defendant that his business was fur dyeing and dressing and that he was connected with the Central Fur Dyeing Co., and that his occupation with that company was "As a dyer. Some merchandise is dressed and dyed." "Do you also dress fur skins?—A. *Not dress by itself without dyeing.*" He stated his firm had handled from 30,000 to 35,000 Chinese goatskins per year since 1933, except in 1937 the amount was about 100,000; that the skins are first examined, those without wool rejected, and the remainder are first caged, if they are full of powder, "then we put them in the dyeing," which bath consisted of an aniline or acid dye, depending upon the color desired. In dyeing a blue color the skins are put in an aniline dye bath plus 3 per centum of 10-volume hydrogen peroxide and there left for from ½ to 1 hour, then wrung out by a wringer and straightened, salt water applied to the leather side with a brush; "After that we leave them lay a couple of hours," let the salt water soak in and then they are hung up to dry; that they are then caged and drummed "to help the leather along" and "make the skin more pliable" and soften the leather; then they are stretched in a stretching machine to stretch the leather and help soften the skin, and then they are put through an electrifying machine. According to the witness all vat-dyed skins were handled the same way after they came out of the dye bath, except for the difference in color and the dyestuff used.

There is nothing in this record to show that the concern with which this witness was connected did most of the processing of goatskins after importation, and while the witness did not state that he added alum-salt to the dyeing bath, it should be remembered that he was testifying only as to a dyeing process and not as to a dressing process, as was the witness who used the alum-salt. The only processing of goatskins from China of which this witness gave evidence of any knowledge was *dyeing*. The court refused to permit him to testify as to dressing

skins because of his lack of qualifications to do so. Yet this same witness testified in this case that he had testified in the case of *Arnhold & Co.* v. *United States*, C. A. D. 74, as follows:

Q. I show you Government's Exhibit 9. Could you dress Government's Exhibit 9 without dyeing it?—A. I only dressed and dyed in one process while I got them wet.

Q. Did you hold yourself out as a *dresser* and dyer?—A. Yes. [Italics ours.]

This witness also testified that since he has been in business he has handled American dressed skins, and particularly since 1933 with Central Fur Dyeing Co., yet he admitted on cross-examination that he had testified in the *Arnhold* case, *supra*, as follows:

Q. Did you process other skins than dog skins?—A. China goat skins.

Q. China goats?—A. China goats.

Q. No American dressed skins?—A. No.

This witness admitted on cross-examination that the skins he dyed badger, in which the dye was brushed on the hair only and nothing done to the pelt side of the skin, had a bad smell after he finished the process and he had to cut out the number; that he is not a chemist and does not know what happens to the skin structure when Ursol dye and hydrogen are applied; that he has processed goatskins with vegetable dyes, using nutgall, tannic acid, and aniline D; that he also processed goatskins with lead acetate and hyposulphate, but when this process was used the pelts smelled bad and he had to put perfume on them. The witness testified definitely that all of the processes to which he had testified to subjecting the goatskins improve the condition of the skin or leather.

On direct examination the witness demonstrated in the courtroom the method of dyeing goatskins which he said he used in his business by taking a piece of collective exhibit 1–A and immersing it in a solution of water heated to 95°, to which had been added, according to the witness, certain dyestuffs, "*Two chemicals, and this one chemical, Ursol and acid dye*," and hydrogen peroxide, letting the skin remain in this solution for approximately ½ hour; it was then removed, wrung out, and cut in half, one part marked exhibit 1–A–1 and the other exhibit 1–A–2. Exhibit 1–A–1 was swabbed. The amount of salt he used he stated was a trade secret. Neither is there any satisfactory explanation of the components of the "Two chemicals, and this one chemical, Ursol and acid dye" going to make up the solution in which the skin was immersed. Many chemicals are well-known tanning agents.

This witness also gave certain testimony as to bleaching Chinese goatskins by employing peroxide of hydrogen and adding a little blue color and brushing the solution on the hair, but again the witness failed to give any information as to the components used in this process, since, as the witness stated, it was his own secret.

The defendant also offered the testimony of Karl F. O. Haack, who stated that he was a dresser and dyer of 50 years, experience. He testified to several processes to which he subjected Chinese goatskins in dyeing them, but was not asked, nor did he state, what process or processes he subjected such skins to when he was dressing them. He testified that in dyeing skins he used a vegetable solution containing logwood, turmeric, sal ammoniac, nutgall, sumac. In answer to one question he testified that logwood is not a tanning agent, that it is a dyeing agent, and to the very next question he admitted he did not know whether logwood was also a tanning agent. In view of the many contradictions in the testimony of this witness, it is not believed necessary to set out his testimony in detail here. He testified that he dyed about 200 goatskins for M. S. & J. A. Workman in 1930 or 1931. He was ordered to bring his records showing this work, but instead of bringing these records, he returned to court and stated his safe lock was accidentally broken. When he finally produced his records they showed he had only *cleaned* two goatskins for M. S. & J. A. Workman, for which he had charged only 10 cents each.

This leaves for our consideration only the testimony given by the chemists. Craig A. Blair, for the plaintiff, and Isidore Schnopper, for the defendant, made a joint analysis of a piece of goatskin cut from collective exhibit 1–A. Witness Blair testified to the results of this joint analysis, at the conclusion of which counsel for the defendant stated:.,

The Government agrees to the figures just recited by the witness.

This joint analysis is as follows:

| | Percent |
|---|---|
| Moisture | 10. 19 |
| Total ash | 9. 55 |
| Fat | 4. 96 |
| Hide Substance | 70. 63 |
| Silica $SiO_2$ | . 41 |
| Aluminum and Iron Oxide | . 45 |
| Chloride and Chlorine | 3. 15 |
| Chloride as salt $NaCl$ | 5. 19 |
| Sulphates as $SO_3$ | 2. 82 |
| Sulphate as Sodium Sulphate $Na_2SO_4$ | 5. 01 |
| Formaldehyde | . 036 |
| Starch present. | |

Witness Blair further testified that he was familiar with the action of tannin on goatskins and that he found no tannin in the skin analyzed, and that the skin had not been changed to leather. This testimony was not contradicted by witness Schnopper, who made the joint analysis with witness Blair and who also testified for the defendant.

The main scientific witness who testified for the plaintiff was John Arthur Wilson. In view of the technical nature of the testimony

given by Dr. Wilson, and the fact that the weight and consideration to be given to such testimony must be based upon his education, achievements, and standing in the scientific world, we shall set out his qualifications rather fully. Since these qualifications are correctly and chronologically set out in the brief of counsel for the plaintiff, we quote the same as follows:

Dr. Wilson is a past president of the American Leather Chemists Association, vice-president of the American Chemical Society, chairman of the Leather Division of the American Chemical Society, a member of the Colloid Committee of National Research Council, which committee studies new phases of science of colloidal chemistry, which include complex reactions of proteins. Dr. Wilson lectured at the University of Chicago on chemistry and proteins, which lectures were given only to graduate students with at least a doctor's degree. He has also lectured in the University of Columbia on contemporary chemistry. He is the holder of the Chandler medal from Columbia for most outstanding achievements in chemistry. It was awarded to him for his work on the chemistry of leather and proteins. He is the holder of the Nichols medal of the American Chemical Society for outstanding publications; is the author of "Chemistry of Leather Manufacture", "Analysis of Leather", "Modern Practice in Leather Manufacture" as well as the author of about two hundred papers dealing with leather, proteins and atomic structure. He was educated at the New York University, Columbia University, University of Leeds and University of Wisconsin; has a degree of Doctor of Science. For eighteen years he was chief chemist and production manager of A. F. Gallun & Sons of Milwaukee, tanners of calf skins; ten years after he was consulting chemist to the leather industries of the United States. He was director of Proctor International Research Laboratory in Leeds, England, whose function was to reveal fundamentals of the protein and the factors involved in the manufacture of leather. Dr. Wilson also is consultant to about fifty tanners and fur dressers. Finally, Dr. Wilson has been selected in "American Men of Science" as one of the thousand leading scientists of America.

The witness stated that the primary purpose of dressing a skin is to render it imputrescible when wet, and so that it will dry out flexible after being wet; that tanning has a very important place in the dressing of skins; that there were certain tests by which it could be determined whether or not a skin was dressed or tanned. Referring to a piece of the imported skins, the witness explained one of these tests as follows:

It was washed to remove the salt that was in it, and then kept purposely in an incubator, at blood temperature. That was a temperature below the temperature at which the skin would be destroyed by the action of heat. I have it here and you can see that it is putrescing very rapidly.

The piece of skin above referred to was admitted in evidence as illustrative exhibit 11.

The witness stated that he had also tested another piece of the imported merchandise which had previously been subjected to the action of Ursol D dye; that he washed and treated it with Ursol D in solution, added hydrogen peroxide, washed it again, and then put it in water, wet it under the exact same conditions as that piece of

illustrative exhibit 11, and that it showed no signs of putrescence. This was admitted in evidence as illustrative exhibit 12. The witness then explained that he had also tested a piece of the imported skins for its resistance to heat, and stated that:

\* \* \*. Instead of drying out soft, as a properly dressed skin would do, it has dried out tinny; the fibers have been glued together, and in gluing together they lose their opportunity to slide one over the other when flexed and produce that hard and tinny effect which contributes to my conclusion of no tannage.

The sample last above referred to was admitted in evidence as illustrative exhibit 13.

The witness stated that having dyed thousands and thousands of furs, he was quite familiar with the operation; that he took a piece of the imported merchandise, and without the use of a mordant, dyed it with the use of Ursol D and hydrogen peroxide; that he then swabbed neat's-foot oil lightly on the flesh side to assist in the lubrication of the skin; that due solely to the oil it did not dry out tinny; that the fibers not gluing together lead him to the conclusion that there had been a combination, important in fur dressing, when the piece was subjected to hot water; that not until a temperature of 140° was reached was there a measurable tendency for this piece to shrink. From this the witness concluded that there has been a definite tanning action by the use of the Ursol D and hydrogen peroxide. "It merely means that you have altered it chemically, so that it becomes more resistant to putrefaction and more resistant to hot water." This sample was admitted in evidence as illustrative exhibit 14.

In order that there may be no speculation or error as to the testimony of Dr. Wilson regarding the atomic structure of the skin, and its reaction to certain treatments, we quote the testimony of this witness, as follows:

Now, if it is in order, I will go on with my picture of the structure of the protein, trying to do it just as simply as I can, and I will go on the simplicity side rather than the other. If you want elaboration, I will be very glad to explain it further.

\*       \*       \*       \*       \*       \*       \*

I will limit it to what takes place in the dressing of Chinese goatskins. As a little foreword, I might explain that a tremendous advance was made in studying what might be called the fine structure of material. It is a very fine structure. All materials are made up of associations of what are called atoms. These atoms are very small in diameter. They run as low as, for example, as in the hydrogen atom, having a radius of only three-tenths of an Angstrom unit. An Angstrom unit is only one ten millionth part of a millimeter, and a hydrogen atom is only three-tenths of one part of that Angstrom unit. I don't think that I need to go into the development of that any more than to point out that those dimensions are much too small to be seen by any magnification with ordinary visible light, but by use of the X-ray light waves, that are so short that they are of the order of magnitude of these atomic diameters reflected.

\*       \*       \*       \*       \*       \*       \*

There is in all skin proteins one fundamental material that is known as collagen, and collagen has exactly the same chemical structure of the X-ray picture for collagens of pigskin, goat skin, or steer hide. Every type of skin protein that has been tested today, shows exactly the same structure. I will not try to go into this thing any further than to show you that the proteins consist fundamentally of a long chain of atoms linked together. The units are called amino-acid residues. An amino-acid has what you call an amino group—$NH_2$—ammonia is $NH_3$; then a carbonyl, a hydrogen, then a carbonyl, an oxygen again, nitrogen, hydrogen again, again a carbonyl with hydrogen and so on to another carbonyl group, and that continues, so that there is apparently no limit to the length of that chain. It is just the thickness of an atom or two.

Now, the X-ray pictures have shown that the chain winds back and forth, These are all atoms attached together. They combine by electrical forces. electrons, which move in orbits, around the nuclei of both atoms, and the two are combined together, then they balance, the same electrons go into the orbit of both.

*     *     *     *     *     *     *

* * * little amino-acid residues, of which there are some twelve or fourteen, repeat in a definite order and every sixth one is called a proline. A proline is an amino-acid, that is U-shaped, so when the chain moves in any one direction, as soon as it reaches a proline it turns it around at an angle of 180. A complete change takes place, so that you get this winding structure. * * *. If this protein is allowed to swell under the action of hot water, or water containing acid, such as hydrochloric acid, the nitrogen and carbon are pulled further apart than the possible radius of the orbits of these electrons. The result is that a rupture takes place. Links form between the carbon and nitrogen with oxygen and hydrogen in between all along the line; we can just represent them on there, that the fine structure of these chains of electrons would collapse on itself unless it had supporting structure. It would be like trying to build a bridge with nothing to support it. Under the action of hot water there is a rupture of natural bridges, which we call an imino-carbonyl link, that is, carbon, oxygen, and hydrogen link, and they occur naturally and are formed naturally when the original collagen protein material is produced by the little white corpuscles of the blood, that are responsible for the manufacture of the fibers of the skin. In the conversion of a raw protein into a material that will resist the putrefying action of bacteria and the enzymes—in this piece of goatskin that corresponded to the first sample here when the temperature of about 115 degrees Fahrenheit is reached, there is a sufficient movement of the carbon from the nitrogen to break that link entirely and, of course, what happens is that like a piece of a spring, the thing winds up on itself, and results in chaos and disorder of the structure, and the reduction in volume to about one-third the original volume of the protein. * * *. In the operation of dressing goatskins we must put in links that are strong enough to make it endure.

Explaining what there was about the treatment of goatskins with Ursol dye plus peroxide of hydrogen either with or without a mordant that strengthens those links and makes them impervious to certain degrees of hot water, the witness stated:

It is customary in organic chemistry to represent what is called a benzene link, with a molecule of benzene, consisting of six carbon atoms joined together and then each carbon atom has combined with it a hydrogen atom. When an amino group replaces a hydrogen, one at either end, the material is then called para phenylene diamine. It is called para phenylene diamine only because of the chemist's method of determining the particular point on this benzene in respect to one. The group in the opposite corner is called in the para position in relation

to some fixed atom that is attached. We have no proof of any action of that particular compound to produce strong links in the protein chain. Now, when hydrogen peroxide is added we get three benzene rings that link together. If hydrogen peroxide is added we take the hydrogen away from certain nitrogens and you get links, nitrogen links, between the three.

That is a molecule long enough to form a link between the chain, and we get an amino group here combined with carbon just as we do in the protein chain, the carbonyl group with the amino group, and this material is bis-diamino-phenyl, para phenylene diamine. I think the idea has been made clear, that you can put strong links in place of weak links.

\*  \*  \*  \*  \*  \*  \*

The chain that replaced the links to be removed has got to be more flexible than that weak link that is removed, by using hydrogen peroxide that gives three of those phenyl groups combined with each other making the total linkage of more than three times the distance, so that with that combined linking in place of the weak imino, carbonyl linking, the protein would be able to swell to a considerable distance without a rupture of the point.

Referring to the action of the Ursol dye and hydrogen peroxide upon the imported merchandise, the witness stated:

The conclusion that I draw is that there was a definite tanning action, if you will. I don't see any reason why you cannot apply that name to goatskin furs, or any other kind of skins. It merely means that you have altered it chemically, so that it becomes more resistant to putrefaction and more resistant to hot water.

The witness also stated that the process to which witness Goorevich testified these skins were subjected in China was a preservative, which meant that the skin in the raw state could be kept a longer time in a better state of preservation; that it did not dress in the slightest degree, and had no effect upon the molecular arrangement of the fibers in these goatskins.

On cross-examination the witness stated that he was not a consultant to any fur dressers in the Metropolitan area and that his activities in that line were centered in Milwaukee, but also stated:

I have had ample opportunity over the past week to relate the goat skin picture with my general knowledge of the structure of the proteins.

Based upon his knowledge gained through his many years of study and experience, Dr. Wilson stated that the imported goatskins were undressed, and gave sound reasons for such statement.

The defendant in turn offered the chemical testimony of Jacob Berson, who stated that he received a degree of chemical engineer from Columbia University in 1917; that he is a fur dyer and research chemist; that from 1917 to 1919 he was engaged in analytical and research work in the field of chemistry, since which time he has been engaged in the development and manufacture of fur dyes and also in the business of fur dyeing; that he is vice president of the Technical Association of the Fur Industry; that he has done much research work in connection with Ursol dyes; has made a thorough study of dressing processes; that he worked 8 or 9 months for a firm

manufacturing lacquers, nitrocellulose, and gun cotton; that "The primary purpose of dressing a fur skin is to convert the raw skin into one which dries out soft and pliable, even after being wet, and that is fit for use." Stating his experience in the fur dressing business, the witness testified:

* * * due to the difficulty I had in getting the correct, right shade in the leather, on the finished product, I had to make a thorough study of the dressing processes and I went through the dressing processes of every kind, that my firm dressed, from when they first came in raw, right through the soaking, drumming and fleshing, soaking again, pickling, *oiling or greasing*, kicking, and continuing after this process of drumming, a caging and finishing. * * *. *The dressing and dyeing are very closely connected.* [Italics ours.]

He stated that in his opinion collective exhibit 1–B was a dressed skin; that he had become acquainted with the practical methods used in the fur industry for distinguishing a raw skin from a dressed skin, and that he had subjected exhibit 1–A–3 to such a test by applying tap water to the pelt side of the skin and letting it dry in the open air at room temperature; that the piece dried out as soft and pliable in feeling and appearance as it was before. This was received in evidence as exhibit 1–A–4.

The witness testified he subjected a piece of exhibit 7, which is a raw skin, to the same test and that it dried out hard and horny. This was admitted in evidence as exhibit 7–A. He further testified he made a test of collective exhibit 1–A by soaking it in tap water 24 hours, squeezing it out, and leaving it to dry at room temperature. He stated this dried out soft and pliable. It was admitted in evidence as exhibit 1–A–5. He stated he applied the same test to a piece of exhibit 7 and this was hard and horny. This was admitted in evidence as exhibit 7–B.

The witness further testified he made another test on another piece of collective exhibit 1–A by soaking it in water for about 48 hours, then removed it from the water, folded it back on itself, then squeezed it with his fingers as hard as he could, then opened up the folds and due to the pressure there was a white line that appeared upon the skin, which he stated was evidence that it is a dressed skin. This was admitted in evidence as exhibit 1–A–6. He also stated he subjected a piece of exhibit 7 to the same test, and where the fold in the skin appeared, there was no change in the white line formed. This was admitted in evidence as exhibit 7–C.

He also stated that he dyed a piece of collective exhibit 1–A or 1–B. He first soaked it in water for 24 hours, then placed it in a solution of 5 grams of Nyanzol D, which is the same as Ursol D or Rodol D, in 500 cc. of water and added 5 cc. of 100-volume hydrogen peroxide, left it for 6 hours, then took it out, squeezed it out, washed it in running water, squeezed it out again, and let it dry at room temperature. This was admitted in evidence as exhibit 1–A–7, and the

witness stated it was soft and pliable. He also stated he dyed a piece of exhibit 7, following the same procedure. This was admitted in evidence as exhibit 7–D and he stated it was hard and horny. He also testified to other tests, which like the tests heretofore detailed, were made outside the presence of the court and also outside the presence of counsel for both parties, to all of which we have given proper consideration, but which we will not detail here.

The witness did not agree with Dr. Wilson's statement that Ursol D was sold to fur dressers, because Gaskell, the firm where he was once employed, did not sell Ursol D to fur dressers from 1913 to 1927; that he had never subjected fur skins to the putrescence test until he tried it on these samples.

On cross-examination the witness admitted that he had not processed any goatskins prior to 1928 or 1929. When asked who were some of the customers of Federal Fur Dyers, where he was once employed, he stated he did not know, "I only was asked to make the colors and produce the dyes." By his own admission the experience of this witness in processing goatskins was limited to coloring badger imitations, and confined to the period of 1928 or 1929.

The witness stated that the primary purpose of dressing skins is to leave the pelt soft and pliable even after being wet. Yet, professing to be a dresser, he did not know what it is that gives softness to a skin. He enumerated the process of dressing a skin as follows:

Soaking the skin in cold water, drumming it for a few minutes in the morning to get it ready for fleshing, fleshing it which is the removing of the flesh from the outside, soaking it again, to get permeable, and the next step which is the dressing solution, soda, alum, salt, sal ammoniac, and maybe some little sal soda, but that is not a sal soda solution, by any means. After that the test described by me, by bending the skin until you get a white line, it is considered dressed. Then it is removed again, drummed out, and put in a drum with sawdust, and drummed nearly dry. It is then *greased*, either by hand or in a kicker, and *kicked*, for a time depending on the nature of the skins.

X Q. So that you would say—— A. I am not finished.

X Q. Go ahead.—A. It is then drummed again to remove the extra *grease*, after which it is *caged*, then the leather is either stretched or pulled, after which it is drummed again and *caged* again, and there may be a few days that the drumming and the caging take place, until it gets the final cleansing, drumming and caging.

X Q. That is the dressing process?—A. That is the dressing process.

* * * A. That is the American dressing process, the one that I know. [Italics ours.]

The above "dressing" process, as testified to by the defendant's own witness, is a far cry from the process to which the imported skins were subjected in China before importation.

At one point he stated that he did not read any books, but practiced his science, and in answer to the seventh question following, he stated "I can refresh my memory as to the formula, if I looked at my books." He stated tannage converts raw skins into leather, but he did not

know what takes place in dressing; he stated that he agreed with Austin, Rogers, Wilson, and Orthman that the dressing or tanning of a skin is converting the skin collagen into a substantially imputrescible substance called leather, as to tanning only. He also admitted that if a bath were made of logwood, nutgall, sumac, turmeric, fustic, and gambier, and a skin immersed in such a bath, it might dress the skin as well as dye it. He also admitted that he never dressed goatskins, and that he had sold a lot of Ursol D to dressers and dyers, although he had previously testified that he never sold a pound to a dresser. When asked the following question:

X Q. On the bottom of this bill, which is Exhibit No. 19, it reads: "We do not guarantee stamps, seals or other devices which may be retained on skins during the process of dressing and for dyeing." What do you suppose that is printed on the bottom of the bill for if they are not dressers and dyers?

he stated: "I am not a dresser and dyer either."

When exhibit 8 was admitted in evidence one witness testified that it was a Chinese goatskin dressed and dyed black. When witness Berson was asked if the skin in exhibit 8 had been changed to leather, he stated: "At this stage leather and not skin," * * *. "In this stage it is leather."

In rebuttal, Dr. Wilson testified as follows:

Q. Dr. Wilson, it has been testified to that caging, placing the skin—I am speaking of goatskins—placing the skin in a sal soda bath and washing it for one or two hours, wringing it out, placing it in a bath consisting of logwood, turmeric, sumac, nutgall, gambier, all together, or one or more of those things, with the metallic mordant added to the bath, in which the skins are allowed to remain for varying periods of time, removing, wringing out, applying a salt water brush to the pelt side, letting them lay for a few hours, drying them, caging, drumming, and electrifying, is a process of dyeing. Is that also a process of dressing? * * * ?—A. It is both dressing and dyeing. It is dressing because it changes the collagen or protein of the skin into an imputrescible material, which is the point that distinguishes between dressed skins and undressed skins.

* * * * * * *

Q. Testimony was offered in the Government's case that if you take a skin, after soaking it in water, and bend the skin between your fingers and crease it sharply and then release the pressure, that if there remains on that skin a white line, it is evidence that the skin is dressed. Will you please state what happens to a skin when it is compressed and flattened out under those conditions? * * *—A. Yes. I have made that test thousands of times, in connection with the manufacture of furs, from sheepskins or lambskins. The formation of the white line under the conditions stated indicates only one thing; that the fibers are not glued together. Now, if a skin such as that Exhibit No. 7 were soaked back in position as it would be with a just week's soaking in ordinary water, then to bend that would not produce a white line, because of the fibers being glued together, would not allow the little air pockets to form. If the fibers are free, so that they can slide one over the other when the skin is taken from the water there is water in the spaces between the fibers and when the spaces are bent over the water is forced out between the fibers. Then when it is forced open the effect of the air spaces is to produce a white line. The answer to the question is that it is not an

indication of dressing, but it is an indication that the fibers have been separated sufficiently to allow air spaces to exist between them.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

In the raw state on the animal's back the fibers of the skin are separated one from the other. They can slide one over the other. That gives the skin its flexibility and ability to stretch and then again to resume its normal structure and shape. Now, when the skin is covered around with flour in water, the flour distributes itself between the fibers and penetrates into the skin, and puts a coating of flour on each fiber. Then when the drying takes place there is a little layer of flour between the fibers that would otherwise be glued together, and that will permit the effect of a white line on creasing of Exhibit 1, because the fibers are coated with the layer of flour in separating the fibers already glued together, and preventing them gluing together in the first place.

Testifying with reference to the action of wood dyes, such as, turmeric and logwood, on goatskins when immersed in a bath containing those ingredients, the witness stated:

I have had enough experience with the action of these wood dyes to be able to state without any fear of contradiction that they definitely convert the collagen protein of the skin into an imputrescible leather.

Again testifying with reference to the action of aniline dyes upon goatskins, he stated:

It is both dressing and dyeing, because the aniline when used as a dyeing agent combines chemically with the protein of the skins, converting them into an imputrescible leather substance.

He also testified that caging, immersing in a dye bath from ½ hour to 1 hour, that dye bath consisting of aniline dye and peroxide of hydrogen, removing from the dye bath, wringing out, and straightening out, brushing with a salt water solution on the leather side, and leaving it for 2 hours, hanging up, drying, caging, drumming, dressing, and electrifying a goatskin, "It is both dressing and dyeing."

Other witnesses gave testimony on rebuttal and surrebuttal, which, while it has received our careful consideration, we do not deem necessary to set out here in detail. Due to the large number of witnesses testifying and the conflicting testimony given by them we have felt it advisable to set out their testimony somewhat in detail. We find nothing novel about a case wherein the testimony upon which it has been submitted is conflicting. In fact this appears to be the rule rather than the exception. In such a case it is the duty of the court to reconcile, if possible, such conflicting evidence, and if this be found impossible, then to determine the weight to be given such conflicting testimony and what it establishes.

The rule that imported merchandise must be classified for duty purposes in the condition in which imported is too well settled to require the citation of authorities here to support it. The question, therefore, for our determination is whether or not the processes to

which these skins were subjected prior to importation were sufficient to constitute the goatskins dressed within the meaning of said paragraph 1519.

There is no question of commercial designation as distinguished from common meaning, presented in this case, and we must therefore determine from the record what the merchandise was in its imported condition. The Standard Dictionary defines fur as:

1. The short, soft, fine coat thickly covering the skin of many mammals: * * * 2 pl. (1). Skins of fur-bearing animals; peltry.

The Century Dictionary defines the same term as follows:

* * *. The short, fine, soft coat or pelage of certain animals, distinguished from the hair, which is longer and coarser, and more or less of which is generally present with it. * * * The skin of certain wild animals with the fur; peltry; as, a cargo of furs. * * * Strips of skin bearing the natural fur, made in various forms, as capes, muffs, etc.

"Peltry," mentioned in the foregoing definitions, is defined by the authorities as "fur skins." It would appear from the foregoing that "fur" is not only the "pelage" or "soft coat" on the skin, but also the skin itself.

The Standard Dictionary defines "dress" as follows:

* * *. To prepare for manufacture; as to dress skins for *leather*. [Italics ours.]

The Century Dictionary also defines the verb "dress" as follows:

To make fit for the purpose intended, by some suitable process; as, to *dress* beef for the market; to *dress* skins. [Italics ours.]

It would therefore appear from the foregoing definitions that "Dressed furs and dressed fur skins" means the "pelage" as well as the fur thereon, ready to be manufactured into fur articles, such as fur coats, muffs, rugs, collars for coats, etc. To the average mind such is indicated by a mere reading of the language. In dressing the fur or pelage, of course, the skin must be dressed also. If this were not done, it is quite evident that the fur could not be worn or used, not only by reason of the bacteria and poison on the skin, but also because the skin would putrefy, if it were not tanned also.

Of course, we should always keep in mind that the legislative intent, "in tariff matters particularly, is the lodestar of judicial decisions." *C. B. Richards* v. *United States*, 22 C. C. P. A. 352. *United States* v. *Guth Stern*, 21 C. C. P. A. 246.

In the case of *United States* v. *Wotton*, 53 Fed. Rep. 344, the Circuit Court of Appeals, First Circuit, in holding certain coney skins to be "furs undressed," observed:

The act of October 1, 1890, (26 St. p. 567,) contains three paragraphs, under some one of which these goods must be classified, namely: (444) "Furs, dressed on the skin, but not made up into articles, and furs not on the skin, prepared for hatters' use, twenty per centum ad valorem;" (587)—in the free list,—"furs undressed;" (588)—also in the free list,—"fur skins of all kinds not dressed in

any manner." These are all the provisions of the act about which there can be any question. The similitude section is inapplicable; that relates only to non-enumerated articles. These furs are enumerated, if held to come under any of the paragraphs quoted. And that they do come under some one of them is not controverted. The difference is in regard to which of the paragraphs of the statute is applicable to these goods. The statute speaks of furs and fur skins generally. It specifies no particular fur, with the single exception of "furs not on the skin, prepared for hatters' use," and even there no mention is made of the animal bearing the fur. Nor, with the same exception, does it refer to the use for which the furs are intended. Paragraph 444 manifestly intends furs so dressed that they are in condition to be made up into what are popularly known as "fur goods," like caps, capes, mantles, muffs, etc. *That such dressing means curing and leathering the pelt is plain, and these are "furs dressed on the skin."* Can there be any doubt that they are dressed fur skins? In the opinion of the court, this language of paragraph 444 shows the meaning of "undressed", and "not dressed in any manner," as used in paragraphs 587 and 588. *They are all to be construed as indicating the leathering of the pelt.*

And these coney skins, which may be adapted to the class of fur manufacturers above referred to, or may have the fur upon them taken from the pelt, and fully "prepared for hatters' use," are to be classified for duties, according to their actual character and condition when imported into the country. In determining that classification, the use to which they will be ultimately put is not to be considered. If it were, goods in all respects precisely alike would at one time be subject to a duty of 20 per centum ad valorem, and at another be entitled to free entry. [Italics ours.]

In the *Richards* case, *supra*, it was contended that it was not the purpose of paragraph 1708 of the act of 1922 to require that any of the articles therein provided for, except "objects of art of ornamental character or educational value" shall have been produced more than one hundred years prior to the date of importation, and that the free importation of only these are subject to regulations as to proof of antiquity. In holding against this contention and applying the rule of congressional approval of judicial construction, the appellate court observed:

The decision of the trial court rests solely upon the familiar doctrine of legislative adoption of judicial interpretation * * *.

\* \* \* \* \* \* \*

In the light of the foregoing, the Congress having made no material change in the language of the statute, we are unable to conclude otherwise than that the limitation relating to age and consequently the regulation "as to proof of antiquity" was intended by the Congress to run to all the articles covered by the paragraph, and legislative intent, "in tariff matters particularly, is the lodestar of judicial decisions."

In the case of *United States* v. *Pacific Butchers Supply Co.*, 22 C. C. P. A. 355, the appellate court, in discussing the effect of legislative adoption of judicial interpretation, said:

Said paragraph 1655 of the Tariff Act of 1922 was reenacted in paragraph 1755 of the Tariff Act of 1930, without change. In view of this fact, it will be presumed that the Congress knew, assented to, and adopted, the construction placed upon the common meaning of these words by this court in the *Bernard* case, *supra*.

Some of the latest expressions of this court on this subject are found in United States v. Columbo Co., 21 C. C. P. A. (Customs) 177, T. D. 46510; United States v. Guth Stern & Co., 21 C. C. P. A. (Customs) 246, T. D. 46777; Smith v. United States, 21 C. C. P. A. (Customs) 514, T. D. 46971.

The common meaning of a term used in the statute, having been once settled and judicially determined, becomes matter of law and continues until changed language in a subsequent legislative enactment seems to necessitate a change in the common meaning of the term. United States v. Felsenthal & Co. 16 Ct. Cust. Appls. 15, T. D. 42713.

\*      \*      \*      \*      \*      \*      \*

Of similar import is the decision in United States v. Masson, 3 Ct. Cust. Appls. 168, which we quote as follows:

\*      \*      \*      \*      \*      \*      \*

\* \* \*. Instead of adopting this suggestion, Congress reenacted paragraph 454, as paragraph 470 of the new act, without any further change than that of substituting for the word "statuary" the word "Sculptures." Whether this change was accomplished in the interest of better English, or whether the legislature sought by using the word "Sculptures" to doubly limit the paragraph to those which were cut, carved, or wrought by hand, it is hard to say. It is enough to know, however, that paragraph 454 of the tariff act of 1897, gave to "statuary" exactly the same definition which paragraph 470 of the tariff act of 1909 gives to "sculptures," and that "statuary" and "sculptures" as defined in these paragraphs are to all intents and purposes interchangeable terms. We must, therefore, consider that the interpretation put upon paragraph 454 by the Circuit Court and the Board of General Appraisers was approved, affirmed, and ratified by the passing of paragraph 470 of the tariff act of 1909. [Italics ours.]

\*      \*      \*      \*      \*      \*      \*

Again in the case of Semon Bache v. United States, 17 C. C. P. A. 273, in considering the question of legislative adoption of judicial interpretation, the appellate court observed:

Congress, with both constructive and actual information of the judicial interpretation and administrative practice thereunder before it, reenacted the precise language which had been the subject of such interpretation and practice.

This seems to us to be a very clear demonstration of congressional intent. [Italics ours.]

Likewise, in considering the same point in the case of United States v. Felsenthal, 16 Ct. Cust. Appls. 15, the appellate court observed:

When the Congress enacted the Tariff Act of 1922 it is presumed to have been conversant with the judicial construction of the common meaning attached to the word "jet." Having reenacted the statutory language in question, it must also be presumed it ratified and adopted such construction, and used the word with the common meaning as judicially construed. United States v. Lamport Export Co., 15 Ct. Cust. Appls. 394, T. D. 42569; United States v. Schmidt, 13 Ct. Cust. Appls. 252, T. D. 41200; United States v. Beierle, 1 Ct. Cust. Appls. 457, T. D. 31506; Wanamaker v. United States, 13 Ct. Cust. Appls. 93, T. D. 40939.

In United States v. Bassichis, 16 Ct. Cust. Appls. 410, in dealing with the same question, the appellate court said:

This and other courts, in many cases, have given controlling effect to the doctrine that the legislature is presumed to have approved of judicial interpretations of tariff

*legislative provisions by the subsequent reenactment of the same or substantially the same language.* United States v. *Baruch,* 223 U. S. 191; *Latimer* v. *United States,* 223 U. S. 501; *United States* v. *Ascher & Co.,* 11 Ct. Cust. Appls. 453; T. D. 39532; *United States* v. *Yuen et al.,* 11 Ct. Cust. Appls. 479, T. D. 39571; *Grauèrt Co.* v. *United States,* 11 Ct. Cust. Appls. 495, T. D. 39632; *Wanamaker* v. *United States,* 13 Ct. Cust. Appls. 93, T. D. 40939; *United States* v. *Basket Importing Co.,* 13 Ct. Cust. Appls. 98, T. D. 40941; *United States* v. *Beierle, supra; United States* v. *Post & Co.,* 3 Ct. Cust. Appls. 260, T. D. 32568; *United States* v. *Frank,* 15 Ct. Cust. Appls. 97, T. D. 42184; *Frei Art Glass Co.* v. *United States,* 15 Ct. Cust. Appls. 132, T. D. 42214; *United States* v. *Lilly & Co.* et al., 14 Ct. Cust. Appls. 332, T. D. 41970. [Italics ours.]

In view of the decision of the Circuit Court of Appeals in the *Wotton* case, *supra,* holding that "dressed" meant a "leathering of the pelt," and the subsequent reenactment of the same or substantially the same language in the acts of 1922 and 1930, in line with the authorities hereinbefore cited and quoted, we must consider that the interpretation put upon the word "dressed" in the *Wotton* case was approved, affirmed, and ratified by the Congress in the enactment of paragraph 1519 of the act of 1930. This seems to us to be a very clear demonstration of congressional intent.

Therefore, in considering whether or not the processes to which the imported goat skins were subjected in China actually "dressed" said skins within the meaning of that term in said paragraph 1519, we shall do so in the light of the definition of "dressed" as interpreted in the *Wotton* case, *supra,* and the subsequent reenactment of that term in the same or substantially the same language, which appears to us to be a clear demonstration of congressional intent that "dressing" means a "leathering of the pelt." This does not seem to be out of harmony with the dictionary definitions that "dress" means to prepare for manufacture, as to dress skins for leather, and to make fit for the purpose intended by some suitable process, as to dress skins.

Since there is no proof of any commercial meaning of the term "dressed" different from its common meaning in the *Wotton* case, under the authority of *Pacific Butchers Supply Co.* case, *supra,* we must hold that the common meaning of the term "dressed," having been once settled and judicially determined in the said *Wotton* case, became matter of law and continues until changed language in a subsequent legislative enactment seems to necessitate a change in the common meaning of the term. Since the *Wotton* decision there has been no changed language which would necessitate a change in the common meaning of the term "dressed." Webster's New International Dictionary defines "leathering" as: "Act of *forming,* applying, or furnishing with leather; * * * ."

According to the testimony herein the processes to which these skins were subjected in China was for the purpose, not of dressing

the skins, but, as one witness stated: "To make them ready for shipment, so that they did not spoil on the way. We prepared them for shipment, that they should not spoil on the way to the United States." Another witness testified that: "It is my personal knowledge that these skins were worked in this way to fit them for shipment. * * *. To preserve them so that they will be in a usable state when they arrive in the foreign country. * * *. To prevent the hair coming out, and to preserve the skins." This testimony stands without contradiction by any one.

Witness Nicholson testified that the solution in which these goatskins are soaked in China is practically the same as for dogskins. A comparison of the processing of the dogskins in the *Arnhold* case, as shown by the decision in that case, with the processing of the goatskins in this case, confirms the testimony of witness Nicholson that the processes in the two cases are practically the same. This being true, it would appear that the two decisions of our appellate court in *United States* v. *Rotberg*, 24 C. C. P. A. 441, and *United States* v. *Arnhold*, 27 C. C. P. A. 135, are controlling of the issue here presented. In fact on the present record as to the processes to which these goatskins are subjected in China, the above decisions of our appellate court compel a holding that these goatskins are not dressed or partly dressed. The evidence as to the processes to which these skins were subjected in China clearly shows that there was no leathering of the pelts. This is amply fortified by the clear, positive, and elucidating testimony of Dr. Wilson, which stands without successful refutation.

Many objections and much argument is advanced against accepting the testimony of Dr. Wilson as having any probative value upon the ground that his experience with dressing goatskins was not as full and extensive as his experience in tanning. In view of the fact that dressing fur skins is a leathering of the pelts, and as Mr. William E. Austin in his book, "Fur Dressing and Fur Dyeing," published in 1922, refers to dressing as a "treatment which will convert the easily decomposing skin into *leather* of more or less permanency," and also refers to "dressed furs" as "tanned furs," we do not take too seriously these objections and arguments against Dr. Wilson, particularly in view of the wide experience this witness has had, and the vast knowledge of the subject manifested by him.

We here quote from chapter V of Mr. Austin's book, above referred to, as follows:

*After the pelts have gone through the preliminary operations* of softening, washing and fleshing, *they are ready to receive the treatment which will convert the easily decomposing skin into leather* of more or less permanency, depending on the method used.

*       *       *       *       *.       *       *

There are several methods which are used in *tanning furs*, each having its peculiar characteristics and qualities, and possessing individual advantages and

disadvantages.   In order to be able to judge the merits of the various processes, it is necessary to have a criterion which can serve as a basis of reference.   Fahrion, a recognized authority and investigator in this field, gives a definition of leather which is usually accepted as a standard for comparison.   He says: *"Leather is animal skin, which on soaking in water and subsequent drying does not become hard and tinny, but remains soft and flexible; which does not decay in the presence of cold water; and which does not yield any gelatine on boiling with hot water."   While the requirements set forth in this statement are essential for leather, and a compliance with them would also be desirable for tanned furs, a somewhat less rigorous standard of conditions to fulfill is satisfactory for the general needs and purposes of furs.   The chief qualities which tanned furs must possess, with particular reference to the leather side of the pelt, are retention of softness and flexibility after being moistened by the furrier for manufacturing purposes, and subsequent drying; and freedom from a tendency to decay during this operation and thereafter.   If the furs are to be dyed, the effect of the dyeing must also be considered, and the tanning must be such as to enable the dyed furs to possess the above qualities.*   [Italics ours.]

In considering the above quotation we should not lose sight of the fact that Mr. Austin, a recognized authority on fur dressing and dyeing, and strongly relied upon in defendant's brief, is here dealing specifically with the subject of "Fur Dressing and Fur Dyeing." Yet he states that in dressing furs, "After the pelts have gone through the preliminary operations  *  *  * , they are ready to receive the treatment which will convert the easily decomposing skin into *leather*  *  *  *  * "; that "There are several methods which are used in *tanning* furs  *  *  *." Still writing about dressing and dyeing furs, he states that "Fahrion, a recognized authority and investigator in this field, gives a definition of *leather* which is usually accepted as a standard for comparison." Still writing about dressing and dyeing furs, and referring to them as "tanned furs" he states:  "If the furs are to be dyed, the effect of the dyeing must also be considered, and the *tanning* must be such as to enable the dyed furs to possess the above qualities."   It is worthy of note that in the above quotation, aside from the heading of the chapter, the words "dress," "dressing," or "dressed" are not once to be found.   After quoting a definition of leather, the writer states that a somewhat less rigorous standard of conditions to fulfill is satisfactory for the general needs and purposes of furs, but he nevertheless still refers to these furs subjected to the less rigorous standard of conditions as "tanned furs."   The above amply supports our views, heretofore expressed, that "dressed furs" are "tanned furs."

Counsel for the defendant makes particular reference, in his brief filed herein, to the testimony wherein the processes to which these goatskins are subjected in China are referred to as tanning, the flour used as tanning flour, and the places where the processes took place as tanneries.   The witnesses explained that when they used the word "tanning" they referred to "Chinese tanning."   This same question

was raised and similar argument advanced in the *Rotberg* case, *supra*. In disposing of the same, our appellate court observed:

Much of the brief on behalf of the Government is devoted to emphasizing parts of the testimony to the effect that the merchandise is referred to in China as "dressed" "dogskins", and it is said in the brief, "The Chinese dogskins here involved were described on Consular invoice No. 1414 as 'Tanned Mukden Dogskins' and were entered, Entry No. 706397, as 'Five Bales Tanned Dogskins (Dressed Furs Not Dyed)'."

We regard it as being of small consequence that the merchandise may have been referred to in China as dressed dogskins, nor is it of particular importance under what name or names the skins were ordered. The question of what they actually are must be determined by United States trade standards. * * *.

In the *Rotberg* case, *supra*, the process to which the skins were subjected was described by the appellate court as follows:

* * *. The first process applied to the skins when treatment of them actually begins is to scrape off fat and remove dirt. They are then placed in the sun for drying. After being dried, they are placed in barrels or vats containing water with which there is mixed a flour, described as "dalyon flour," made from some kind of Chinese cereal. They remain in these barrels or vats for several days—one witness says, "perhaps six or seven days." They are then taken out and put in the sun for drying. After being dried, if any are in a very hardened condition such are returned to the barrel or vat, again soaked, and again dried in the sun. After being dried, the skins are packed in bales, 200 to 300 skins to the bale, by press packing machines, and thus exported.

In the *Arnhold* case, *supra*, the process to which the skins were subjected, was stated by the appellate court as follows:

In the case at bar it is established that, in addition to the process described in the *Rotberg* record, there was employed in the treatment of the skins in China sea salt, to the extent of three-quarters to 1 pound to the gallon of water, and that sea salt contains sodium sulphate and sodium chloride.

The processes described above are not at all dissimilar to the processes to which the goatskins in this case were subjected in China. Likewise the processes to which the skins in the *Rotberg* and *Arnhold* cases, *supra*, were subjected after importation, as shown by said decisions, were not at all dissimilar to the processes to which the present goatskins were subjected after importation.

The processes to which the imported goatskins were subjected prior to importation did not include any pickling, oiling or greasing, kicking or caging, which defendant's witness Berson testified were included in "dressing," according to his understanding. It is to be noted also that witness Berson did not apply any soaking in salt water and flour in his dressing process. Strangely enough not a single witness in this case included in or as a part of a "dressing" process the process to which these goatskins were subjected in China. The processes of dressing furs in the United States, as shown by this record, are so different from the processes to which the instant goatskins were subjected in China that it is impossible to reach any other conclusion

than that these goatskins were not "leathered," "tanned," or "dressed" in China.

While some of the witnesses in this case attempted to testify that these goatskins were used in the exact condition in which imported, without being subjected to any process, the weight of the credible testimony clearly establishes that these goatskins were in fact never used in the condition as imported, but were always subjected to some processes after importation before being made into articles of wearing apparel.

There is testimony in this record that in the American dressing of fur skins, one of the processes is to place them in a "dressing solution." Just what ingredients are contained in this "dressing solution" is not made clear, but the evidence shows that in a majority, if not in all cases, these imported goatskins are subjected to a bath containing logwood, sumac, fustic, turmeric, dogwood, and tannic acid, to which is usually added hydrogen peroxide, all or any one of which are well known and recognized tanning materials. When witness Emrich was being interrogated as to whether he used tannic acid for a coloring or for the purpose of tanning, was asked "X Q. Tannic acid is a tannin, isn't it, for tanning leather?" he answered "A. Not that particular color *I have it in for both purposes*, and for color." [Italics ours.]

We feel that no useful purpose would be served by a further analysis in this opinion of the voluminous testimony in this record upon the question here involved. We have, however, carefully considered and weighed all of the evidence before us in this case, conflicting and otherwise, having observed the demeanor of the witnesses testifying, and find as a fact that the weight thereof establishes that the processes to which the instant. goatskins were subjected in China, whether considered in the light of the definition of "dressed" as judicially determined in the *Wotton* case, *supra*, and the subsequent reenactment of the same or substantially the same language in said paragraph 1519, or otherwise, does not *dress* or *partly dress* said goatskins within the contemplation of said paragraph 1519.

For the reasons hereinbefore stated, and following the cited and quoted authorities, we therefore hold that the goatskins in this case which were assessed with duty at 25 per centum ad valorem under paragraph 1519 of the act of 1930, as dressed furs or dressed fur skins, are properly entitled to free entry under the provisions of paragraph 1681 of said act, for "Furs and fur skins, not specially provided for, undressed," as claimed by the plaintiff.

To the extent indicated the specified claim in this suit is sustained; in all other respects and as to all other merchandise all the claims are overruled. Judgment will be rendered accordingly.

WALKER, Judge: It is with considerable regret that I find myself unable to concur in the decision rendered by my colleagues on the very important issue raised in the case at bar. The question presented is principally one of fact, and, as I see and view it, the evidence offered establishes overwhelmingly that the skins at bar were, in their imported condition, dressed within the common meaning of that term. I do not believe that any of the decisions of this or our appellate court on the subject of goatskins or dogskins are controlling of the issue herein, nor do I believe that the decision of the Circuit Court of Appeals in the *Wotton* case, cited by the majority, compels, by virtue of the rule of legislative adoption of judicial interpretation, a holding that the skins at bar were not dressed as imported.

The majority opinion has, of necessity, reviewed at great length the voluminous and detailed testimonial record submitted. No useful purpose, therefore, would be served by a repetition here of the facts set forth, and attempt will be made to avoid such repetition, but I do deem it worth while to state that the summary given in that opinion does not, and, of course, cannot reflect the minute particularity in which each witness was interrogated, and the great mass of detail brought out thereby.

I have carefully read the testimony given by the witnesses Goorevich (R. pp. 13–73) and Silverberg (R. pp. 755–767) for the plaintiff, and Nicholson (R. pp. 493–571) for the defendant, with respect to the processing to which goatskins such as those at bar were submitted in China. It cannot be said to have been established by such testimony, standing alone, that the skins were or were not dressed in China. It is significant to note, however, that throughout his testimony plaintiff's witness Goorevich referred frequently to the places where such processing was carried on as "tanneries" (R. pp. 15, 18, 19, 49, 57), and the process itself as "tanning" (R. pp. 61, 62), although he later characterized the process as "Chinese tanning" (R. p. 62). What effect the addition of the adjective "Chinese" to the meaning of the common English word "tanning" should have is not attempted to be explained, nor does it appear that "Chinese tanning" is any the less "tanning."

It is pointed out by the majority that this witness and the witness Silverberg testified that the purpose of the processes applied to the skins in China was "to make them ready for shipment, so that they did not spoil on the way" (R. p. 46); "to preserve them so that they will be in a usable state when they arrived in the foreign country" (R. p. 766); and "to prevent the hair coming out, and to preserve the skin" (R. p. 767), adding that such testimony stands without contradiction by anyone. I see no reason why this testimony should be contradicted. All of the purposes stated above would be served by

a dressing process, and it is manifest that if the skins were preserved at all such preservation might well have gone beyond the prevention of spoilage and, in fact, have amounted to a dressing of the skins fitting them for subsequent use as dressed furs.

The defense called witness Martin R. Nicholson to testify concerning the processing of skins such as those at bar in China. Nicholson, a Treasury attaché stationed in China, had made an investigation of the process through which goatskins similar to exhibits 1–A and 1–B were put in Tientsin, China. There is some variance between his testimony and that of witnesses Goorevich and Silverberg.

Instead of soaking the skins from 3 to 8 hours, as witness Goorevich did, Nicholson found that the Tientsin processors had them thoroughly beaten with bamboo sticks and then placed in a bath of clear water for 2 hours. Then they were placed in a solution of water and a substance called by the Chinese hsiao, or saltpeter, although it appears to be some form of salt. Here they remained for 12 hours, after which they were allowed to drain. They were then fleshed to remove the grease and fat. Millet flour, known as Huang Mi, was added to the saltpeter solution, and after stirring the solution the fleshed skins were placed therein, where they remained for 5 days. The skins were removed from the kongs each day and part of the solution was taken out and heated and then replaced in the kong, but it appears that the temperature of the solution in the kong did not rise above 110° F., which would possibly fall within the description of the witness Goorevich of "like warm water," or it may be that this heating shortened the immersion period from the 9 to 11 days described by Goorevich. Mr. Nicholson identified the odor in the tanneries during this time as a "yeasty" odor, and also noticed "a slight working of the solution."

On the sixth day the skins were examined and then dried in the sun. They were then sprayed on the pelt side with water and scraped, after which they were drummed in electrically operated drums then scraped or "staked" with a hand-and-foot operated knife, and then beaten with bamboo sticks (R. pp. 499–523).

During the course of witness Nicholson's testimony Government counsel attempted to introduce pictures of the various steps of the processing of skins in China, which pictures were taken by the witness himself or under his supervision and direction and while he was personally present, but because of frequent objections by plaintiff's counsel, which were sustained in many instances by the majority of the court, this member in each instance dissenting, much evidence which in my opinion was clearly competent, material, and relevant was denied the record (See R. pp. 509, 517–523.)

From the careful reading of the testimony of plaintiff's witnesses Goorevich and Silverberg and defendant's witness Nicholson as to

the processing in China, it would be to me ridiculous to conclude therefrom that all of this processing was necessary to keep the skin from spoiling during shipment. It is a matter of common knowledge that green and undressed fur skins are shipped in great quantities to this country.

We come now to the testimony given by importers of fur skins. Plaintiff called Meyer S. Workman, whose testimony appears in the record at pages 73 to 90. Particular attention is called to the witness's testimony on pages 80, 81, 85, and 86, from which it appears that upon the sale of the skins such as those at bar it was the universal practice in this witness's transactions to have the skins left ·in his store to be later delivered, according to directions given to the witness by the purchaser, to certain persons or firms which he characterized as "dressers and dyers." He did not know of his own knowledge whether these persons dressed as well as dyed skins, and first stated that he called them dressers and dyers because "that is what they call themselves," but upon it being pointed out to him that the firm to which he sent most of the skins used the name "Central Fur Dyeing Company" he stated that he called them dressers and dyers because "that is what the trade calls them."

View this testimony in the light most favorable to plaintiff, and the final conclusion must be that it is plain and simple hearsay testimony, and of no value.

Taking the defendant's witnesses who were importers, and we find the first such witness is Nathan Berlin (R. pp. 233–251). This witness testified that he was an importer and seller of fur skins for over 35 years. Then, after repeated and vigorous objections made by counsel for the plaintiff, covering approximately the next 10 pages of the record, the witness finally, on page 245, stated he bought and dealt in Chinese goatskins for 25 years to the number of about 25,000 (R. pp. 249–251). He further said he sold them as "dressed skins" (R. p. 250)..

Next called was the witness Joseph Ullman (R. pp. 251–262). He testified he was engaged in selling raw furs for 41 years and had imported and sold dressed furs also, at times. He had imported skins like exhibit 1 for 25 or 30 years and said that they were "dressed China goat" (R. pp. 252, 259, 261, 262).

Defendant called as an importer also J. Henry Bleistein (R. pp. 263–273). This witness said he was an importer of fur skins for about 30 years from China and Japan (R. p. 265). He further said he imported skins like exhibit 1 from North China to the number of about 25,000 or 30,000 (R. p. 268), and he stated they were dressed goat skins (R. p. 270, 271, and 272).

Each of these witnesses testified that skins such as exhibit 1 were sold as "dressed" skins (R. pp. 250, 259, 269), and the two witnesses

who were interrogated on the point stated that in so selling them they were acting as American businessmen in the American market (R. pp. 251, 259).

Reviewing the testimony of these witnesses, regardless of the conflict therein, it must be conceded that the overwhelming weight thereof is with the defendant, since the testimony of its witnesses has not been impeached or discredited in any fashion. This is in line with the decisions of our appellate court where a conflict appears, for surely it must be the intent of the decisions of the appellate court that where the proof is overwhelming and the witnesses not impeached or discredited it must be construed in favor of the party producing the great weight thereof.

Next we come to the manufacturers of fur skins. Plaintiff called as its first witness Morris Kass (R. pp. 90–102), who stated he had been in that business for 27 years, and had handled skins such as exhibit 1–B to the extent of 30,000 or 40,000 in the period from 1929 to 1939. It appeared from his testimony that he had tried to use such skins in the condition as imported, but "they have too much trouble with them, *because of the smell of it. It is too strong*, and they have a lot of trouble with them, and thereafter they had to send them to the dresser and dyer, so as to have them *cleaned*" (R. p. 94). It is noteworthy that this witness did not state that he sent the skins to the "dresser and dyer" to be dressed and dyed, but only to be *cleaned* and dyed (R. pp. 92, 95), and he testified:

Q. When they came back from the dresser and dyer, what was the condition of the pelt?—A. The condition of the pelt is different. It is very soft, and the hair is very glossy, and it is usable for fur purposes.
Q. Is it clean?—A. Very clean.
Q. Both the hair side and the skin side?—A. Yes, sir (R. pp. 94–95).

He further testified:

Judge KINCHELOE. These people that you sent these skins to, dressers and dyers, as you call them, did you ever see them dressing and dyeing them, either or both?
The WITNESS. Well, not very often.
Judge KINCHELOE. You don't know. You don't know what they do to them?
The WITNESS. No, sir (R. p. 97).

After the witness stated that he remembered a conversation he had with Government counsel and Henry Norman, a customs agent, at which one L. H. Isacoff was present, he testified as follows:

X Q. Do you recall stating to Mr. Norman and myself that you were sure you could furnish sufficient evidence to establish that at least 25 per cent of the Government's claim that these Chinese goat skins were dressed, do you recall making such a statement?—A. I do not. I probably had said that I can say that 25 per cent were not usable for my purposes; that is possible.
X Q. Do you recall making the statement to Mr. Norman and myself on February 26, 1941, at the office of Horowith & Isacoff, 242 West 30th Street, that if you were given a thousand dollars by the Government you would furnish evi-

dence that would constitute at least 50 per cent of the Government's proof that the Chinese goat skins were dressed?—A. *I probably did say so.*

X Q. You did say so, did you not?—A. Knowing that I cannot accept any money from the Government, and knowing that I would have to tell not the truth.

X Q. But at least you offered to testify for the Government for a thousand dollars?—A. If I did say anything of the kind it was merely a joke. [Italics added.] (R. pp. 100-101.)

From a perusal of the testimony of the witness Kass there seems to be one logical conclusion to be drawn, namely, that the failure of the witness to show or express indignation when charged with offering to testify for the Government for a thousand dollars is the best proof that all of the testimony of the witness was false.

Abraham Goodman, the next witness called by the plaintiff (R. pp. 128-140), had been in the fur manufacturing business for 9 years. At page 137 of the record he testified that exhibit 1 was undressed, but in this connection note his testimony on page 138 to the effect that he didn't know what was done to the skins by the Central Fur Dyeing Co., to which he first said he sent the skins "to soften the leather, and dye them the shades necessary" (R. p. 133) and later, on being pressed, said he sent them to be dressed. It is clear that the witness knew nothing of dressing, and it is equally clear from his testimony on recall at pp. 165-166 and certain bills he produced at that time that he paid for dyeing only and not for dressing the skins.

Robert Workman, the next witness for the plaintiff (R. pp. 141-145), testified that he had been a manufacturing furrier for 18 years and during the period from 1929 to 1939 had handled about 12,000 skins such as exhibit 1. These, he said, had been sent to Arnold Haack and the Central Fur Dyeing Co. "to be made into a presentable and workable condition, so that we could cut them up, and manufacture them and sell them to our trade." The testimony of this witness in reality proves nothing in issue.

The defendant then called Rubin Kigner (R. pp. 273-295), who said he had been a manufacturing furrier for 25 years, and had bought 40,000 or 50,000 skins such as exhibit 1 in the period from 1929 to 1939. These, he said, were purchased as dressed goatskins (R. p. 277), and the whites were sent out to be bleached and the others to be dyed by Haack & Co., Central Fur Dyeing Co., Weinstein & Olson, and Van Dye Way (R. pp. 275-276). In connection with the skins sent to be dyed the instructions given were for dyeing only (R. p. 276).

Defendant next called Solomon Meshel (R. pp. 305-317), who testified that he had been a fur manufacturer for about 25 years and had bought between 60,000 and 70,000 skins such as exhibit 1 during the period from 1929 to 1931 as Chinese dressed goatskins (R. p. 309). After purchasing them he sent them to Weinstein & Olson and Van Dye Way Co. with instructions to dye the skins (R. p. 309), and it is noted that a bill which he produced at the

request of counsel for the plaintiff, and which was received in evidence as plaintiff's exhibit 19, calls for "Faun goat skins to be dyed skunk."

Bernard Greenberg, called by the defendant (R. pp. 317–331), said he had been a fur manufacturer for 15 years, and that during the period from 1935 to 1938 he had handled approximately 20,000 skins such as exhibit 1. He testified that based upon his experience with other furs in his opinion such skins were dressed (R. p. 323).

Defendant called Louis Hochbaum (R. pp. 583–597), who testified that he was a manufacturer of furs for 12 years, and in the years from 1934 to 1939 had bought between 50,000 and 100,000 skins such as exhibit 1 (R. p. 588), some of which he had bleached (R. p. 588) and some dyed (R. p. 587), principally by the Central Fur Dyeing Co.

The last fur manufacturer called by the defendant was Samuel Meshel (R. pp. 597–602), who testified that during the years from 1935 to 1937 he had purchased approximately 50,000 or 60,000 skins such as exhibit 1, which he sent to the Central Fur Dyeing Co. with instructions to dye them (R. p. 599), after which they were made up in collars and put in linings and sold to the manufacturers of cloaks and suits (R. p. 599).

A careful, logical analysis of the testimony of those witnesses who were fur manufacturers and were called by the plaintiff, and those who were called by the defense, must, of necessity, compel one to the conclusion that the overwhelming weight of credible testimony is with the defendant, and indicates that the skins were bought and sold as dressed skins and were, in the main, sent to dyers to be *dyed*, not dressed.

We now come to the testimony given by experts in the field of dressing and dyeing. The first of two such witnesses called by the plaintiff was Emil Olson (R. pp. 103–126), who stated that he had been in the fur tanning and fur dyeing business for 45 years, and that during that time, and particularly between 1929 and 1939, he had "processed" goatskins from China like exhibit 1. He described the process he used (R. pp. 104–109), a summary of which is given in the majority opinion. On page 112 of the record he testified:

Q. Do you consider Exhibit 1 a dressed or undressed Chinese goat skin?— A. I would consider that a raw skin processed.
Q. Dressed or undressed?—A. Undressed.

It is apparent from the witness's testimony on page 114 that he considered "dressing" to be synonymous with "cleaning," as applied to furs.

When we consider the testimony given by experts in the dressing and dyeing of furs we find a peculiar situation. Witness Olson testified that in "dressing and dyeing" goatskins such as those at bar certain commonly known tanning materials such as sumac, nutgall, tannic acid, logwood, and fustic were placed in the dye bath (R. p.

106), the inference, of course, being that the skins were thereby dressed as well as dyed in this bath. Plaintiff's other expert on dressing and dyeing, Irving Becher, whose testimony appears in the record on pages 791 to 815, maintained that it was necessary to dress the skins first by a separate dressing process before dyeing them (R. p. 795). Still another version is what might be considered the "official" version of what took place after importation, as given by plaintiff's scientific witness, Dr. Wilson, whereby the theory was that the skins were not dressed by either the Olson or Becher methods but by the action of the dyeing materials themselves. It might be noted, however, that Olson's statement as to what was done was flatly contradicted by one of defendant's witnesses, Weinstein, who had been connected with the same firm, and that witness Becher had had a very short experience in the treatment of goatskins such as those at bar.

On its part defendant called as an expert witness Fritz Emrich (R. pp. 332–439). He stated that he had been with the Central Fur Dyeing Co. since 1933 and supervises the whole factory, being in charge of dyeing and finishing. He stated that he had handled from 30,000 to 35,000 Chinese goatskins like exhibit 1 per year, except in 1937, when the amount was about 100,000. It is noted that witnesses Meyer Workman, Robert Workman, Goodman, Bleistein, Kigner, Solomon Meshel, Samuel Meshel, Greenberg, and Hochbaum testified that they sent goatskins like exhibit 1 to Central Fur Dyeing Co. for processing, and apparently Central Fur Dyeing Co. was one of the largest, if not the largest, processors of such skins in the country.

Emrich testified that upon receipt the skins were first examined to see which were good for dyeing purposes. Those without wool were thrown out and rejected (R. p. 334). The remainder were first caged to remove the powder in them and to soften them up, since they were all pressed together when received, and then they were put in the dye bath, which consisted of aniline or acid dye, according to the color desired (R. p. 334). If a blue color was desired they were put in an aniline dye bath plus 3 per centum of 10-volume hydrogen peroxide, left for half to a full hour, wrung out by a wringer and straightened, salt water applied to the leather side "to help the leather along" and "to make the skin more pliable," and left to soak in salt water for a couple of hours, then hung up and dried (R. p. 334).

After drying they were drummed with sawdust to soften the leather, make the hair more pliable, and put a finish on it, then caged to remove the sawdust and soften the leather, then stretched in a stretching machine to stretch the leather side to compensate for shrinking in the dye bath and also to help soften the skin, and then they were put through an electrifying machine to pull the hair straight and brush it down (R. pp. 333–337). Aside from the difference in color and

the use of the dyestuff for that particular color, all skins which were vat-dyed were handled in the same way after they came out of the dye bath (R. p. 340).

Note that this witness, who was connected with the firm which apparently did most of the processing of goatskins after importation, did not add alum-salt or other recognized tanning materials to the dye bath, as did witness Olson, nor did he dress the skins first, as did witness Becher.

The witness cut a piece of exhibit 1-A and dyed half of it in the courtroom by immersing it in a solution made of dyestuffs consisting of Ursol and acid dye and hydrogen peroxide which he produced, and, after dyeing, which took slightly over a half hour, he wrung it out (R. pp. 371-373, 392). It was cut in half, one part being marked exhibit 1-A-1 and the other being marked exhibit 1-A-2. The witness swabbed exhibit 1-A-1 for a minute with a common salt solution, and then explained that in his factory he would hang it up to dry, drum and cage it, stretch, drum again, cage again, stretch again, and electrify it (R. pp. 407-412). These processes, of course, were not done in the courtroom.

In certain cases, the witness said, in connection with Chinese goatskins the same as exhibit 1, save that they were white in color, they would be bleached instead of dyed. In that case peroxide and other materials consisting of a trade secret were brushed on the hair side of the skin, the skins left overnight, dried, drummed, caged, and electrified, no work being done on the leather side of the skin except drumming so that the powder would come out (R. pp. 341-343).

In connection with dyeing goatskins stone color, he testified that the skins had to be washed for an hour before dyeing in a solution of soda ash and water, using a paddle-wheel bath. Then they were wrung out in a wringer to take everything out of the hair. Then they were placed overnight in a mordant consisting of iron sulphate, sal ammoniac, and tartar emetic. They were then wrung out again, placed in a solution of nutgall, tannic acid, and aniline D or Ursol D, after which they went through the same process of drumming, caging, etc., already described (R. pp. 428-429).

The witness stated (R. pp. 432-433) that all the processes described, except the process whereby the bleaching or dyeing solution was brushed on the skin, improved the leather or pelt side of the skin.

The testimony of defendant's witness Karl F. O. Haack, a dresser and dyer of 50 years' experience (R. pp. 439-493, 721-730), is substantially the same as that of Emrich as to the processes he used in dyeing goatskins such as exhibit 1, and the same is true of the testimony of defendant's witness Max J. Weinstein (R. pp. 702-714), who was engaged in the dyeing business with plaintiff's witness Olson from 1929 to 1932, save that witness Weinstein stated that the skins were

given a preparatory bath in a sal soda solution to wash out any dirt, lime, or grease that might be in the hair, and to make it receptive to the dye (R. p. 707).

In view of the testimony of witnesses Emrich, Haack, and Weinstein, I am of the opinion that the preponderance in weight of evidence as to the treatment which skins such as exhibit 1 received after importation establishes that it was for the purpose of dyeing them only and that any improvement in the leather side of the skin, such as increased softness and pliability, was incidental to the dyeing thereof and did not amount to a dressing operation.

At this point it would be well to state that it appears to be universally agreed that before being used for garment purposes fur skins must be dressed. Plaintiff, maintaining in this case that the skins at bar were not dressed as imported, claims that such dressing took place after importation. Great reliance is placed by the plaintiff on the testimony of Dr. Wilson, who, predicating his testimony on the fact that the skins were subjected to the action of a bath containing Ursol D and hydrogen peroxide, stated that such bath simultaneously dressed as well as dyed the skins (R. p. 183-836). We may therefore disregard the testimony of witnesses Olson and Becher with regard to the use of other dressing or tanning materials, and consider the fact to be that if the skins were dressed at all in the dye bath such dressing was caused by the action of Ursol D and hydrogen peroxide.

In connection with the final category of witnesses who testified in this case, viz, chemists, it is observed that the majority has quoted a chemical analysis made by plaintiff's witness Craig A. Blair, whose testimony appears in the record at pp. 147-164. This analysis (plaintiff's exhibit 18) appears to contribute nothing to the solution of the question before us. Witness Blair testified that he found no tannin in the skin analyzed, and that the skins had not been changed to leather and were not tanned (R. pp. 157-158). It nowhere appears that tannin must be present in dressed fur skins, and all of this witness' experience with leather and tanning had been in connection with the leather industry, the requirements of which are considerably different from those of the fur industry, and he admitted on cross-examination that he had no experience in fur dressing and did not know of his own knowledge what the requirements of a fur dresser were to constitute a dressed fur skin (R. p. 159).

As stated by the majority, Dr. John Arthur Wilson (R. pp. 168-232, 815-873) was the main scientific witness who testified for the plaintiff. While it appears that Dr. Wilson is a consulting chemist of great learning and experience, it is also a fact, which cannot be stressed too strongly, that Dr. Wilson's experience as related by him and as quoted in the majority opinion *has been almost exclusively in the field of leather and not of furs*. While his achievements, contribu-

tions, and work in the field of leather are set forth in great detail, nothing of the sort was shown in the field of fur dressing, the technique and purpose of which vary considerably from those of leather dressing or tanning. There is nothing in the recital of Dr. Wilson's qualifications as set forth in the majority opinion, save possibly the fact that he is consulting chemist for J. Laskin & Sons, manufacturers of furs from sheepskins, to indicate any qualification to testify as an expert on fur dressing. Upon what phase of fur manufacture he is consulted by J. Laskin & Sons does not appear, and although he testified in response to the question

Are you consulting chemist to many tanners and fur dressers? (R. p. 171.)

that he acted as such for "possibly fifty," nevertheless just how many were leather tanners and how many were fur dressers was not given. For all the record shows the ratio might be 49 to 1.

To the question

Have you since familiarized yourself by study and practice with the dressing or tanning of skins used for fur purposes? (R. p. 172.)

he answered, "I have," but what study and what practice were undertaken do not appear, nor does it appear since what time he undertook such study and practice, although he later testified on cross-examination that his experience with Chinese goatskins was *confined to the week immediately preceding his testimony* (R. p. 205), and that none of his clients dress Chinese goatskins (R. p. 206). Although he testified that he was "familiar by study and practice with the *practical* dressing and tanning of animal hides or skins, including goatskins" (R. p. 172), both he and counsel for the plaintiff admitted that he did not qualify as a "*practical* dresser," although counsel insisted that he qualified as a "*scientific* dresser" (R. p. 825), whatever that may be. [The italics are mine in each instance.]

Generally speaking, Dr. Wilson's testimony is divided into two parts: First, a detailed account of tests to which he submitted various samples and the conclusions he drew therefrom, and, second, an explanation of his conception of the atomic structure of skin protein and the effect of dressing and dyeing processes thereon.

In view of the importance attributed by the majority to the testimony of Dr. Wilson, I deem it worth while to set forth my analysis of it.

The primary purpose, Dr. Wilson said, of dressing a skin is to "render it imputrescible when wet, and so that it will dry out flexible after being wet" (R. p. 172). He found exhibit 1 not to be dressed for three reasons: The first reason was that the skin had not been rendered imputrescible. To test this he stated that he took a piece of exhibit 1 which was wet with water, washed it so as to remove the salt that was in it, and then kept it purposely in an incubator at blood temperature.

This was offered and received in evidence without objection as plaintiff's illustrative exhibit 11, and the witness pointed out that it was putrescing very rapidly (R. p. 175).

At this point it might be well to point out that defendant's witness Berson, a chemist of great experience in the dressing and dyeing of furs, testified that he soaked a piece of exhibit 1 thoroughly under tap water, squeezed it lightly, and put in it a bottle which was placed in an incubator at blood temperature overnight, and witness Berson testified that there was no odor of putrescence therein. That bottle and contents were received in evidence as defendant's exhibit 1–A–8 (R. p. 647). Further, witness Berson applied a few drops of water to the pelt side of a portion of exhibit 7, a raw skin, placed it in a bottle which was placed in an incubator at blood temperature overnight, and the witness testified that the odor therefrom was so putrid it was sickening. This bottle and its contents were received in evidence as defendant's exhibit 7–E (R. p. 648).

The difference in the result of the same test applied by two different witnesses, of course, cannot be reconciled.

The second reason why Dr. Wilson believed exhibit 1 was not dressed concerned the result of a so-called shrinkage test. He took a piece of the skin which had been washed in running water, left in the water overnight, so that the salt was washed out, and thoroughly wet it back. He tested this skin for its resistance to heat when placed in water as follows: He cut a small strip over an inch and a half long and punched holes about an inch and a half apart. This was suspended in a water container from a hook at the top, the other end being held at the bottom of the container so that any shrinkage could be detected quantitatively. The water was heated degree by degree, and there was no change until 118° F. was reached. Then there was a rapid shrinkage, a loss of 10 per centum, in the course of about 1° change in temperature, indicating to him that the protein structure was breaking down. He stated that this was a low shrink temperature, and to him it signified very clearly, from having made thousands of such determinations on raw skins and skins in different stages of dressing, that shrinkage at a temperature of 115° to 118° is proof that there was no tannage (R. pp. 179-180).

As indicating the effect of the dyeing operation with Ursol dyes and hydrogen peroxide, to which the various witnesses testified skins such as exhibit 1 were subjected after importation, Dr. Wilson testified that he took a piece of skin from exhibit 1 and put it through the process of dyeing, purposely leaving out a mordant, but adding a step of swabbing neat's-foot oil lightly on the flesh side of the fur before it was allowed to dry, to assist in the lubrication of the skin. *It appears that as a practical matter no dyer of goatskins swabbed such skins with neat's-foot or any other oil, and the doctor admitted that it had the effect of*

*making the fur dry out soft and flexible.* From this alone, it is apparent that the test made by the doctor did not truly represent the actual dyeing of goatskins such as exhibit 1. However, when submitted to the shrinkage test, this piece, which was marked plaintiff's illustrative exhibit 14, had no measurable tendency to shrink until the temperature of 140° F. was reached, and from that he concluded that there was a definite tanning action; that the skin had been altered chemically so that it became more resistant to putrefaction and more resistant to hot water (R. pp. 182–183).

Another piece of exhibit 1 was taken by the doctor, according to his testimony, and subjected to a mordant, following which it was dyed and treated with neat's-foot oil. This reached a temperature of 154° before shrinking measurably. It was marked plaintiff's illustrative exhibit 15 (R. p. 184).

I am of the opinion that the difference in shrinkage temperature between illustrative exhibits 14 and 15 is very revealing. The only difference in treatment was the addition of a mordant previous to the dyeing in the case of illustrative exhibit 15. A mordant, according to the doctor, is a chemical material that will combine rather vigorously with the material to be dyed and then subsequently will combine with the dyestuff, which brings about a combination between the dye and the material to be dyed that might not take place sufficiently if there were not a link in between (R. p. 181–182). No witness in this case suggested that it has any tanning action, and, in fact, witness Olson testified that it is not used for tanning purposes (R. p. 125). *Yet it exerted sufficient influence upon illustrative exhibit 15 to raise the shrinkage temperature from 140° to 154°, although the testimony of the doctor would indicate that the amount of tannage is directly proportional to the shrinkage temperature.* The only conclusion to be drawn, therefore, is that other factors besides tannage influence shrinkage temperature.

On the subject of shrinkage temperature, witness Jacob Berson testified he had never known of shrinkage tests to be utilized in the fur industry in connection with fur skins (R. p. 651). In his opinion such tests would not determine whether a fur skin was raw or dressed because the shrinkage temperature in a dressed skin signifies only what chemicals were used in dressing it, quoting as authority for that statement Proctor's Leather Chemistry Handbook, at page 300, where it appears that the shrinkage temperature of alum-tanned leather is between 50° to 60° C. (112–140° F.), while the shrinkage temperature of a pelt is 40° to 60° C. (104–140° F.); in other words, the upper limit is the same (R. pp. 651–652).

It is significant that no other witness for the plaintiff or defendant testified to the use of shrinkage temperature as a test of dressing, and in his testimony the doctor fails to state whether it is used anywhere outside of the leather industry or whether anyone but himself regards

it as a valid test in the determination of whether or not fur skins are dressed.

The third reason which led Dr. Wilson to believe that exhibit 1 was not dressed was the result of washing a piece thereof in ordinary fresh water and drying it. Instead of drying out soft, it dried out tinny, the fibers having been glued together and in gluing together they lost their opportunity to slide over one another when flexed, and produced a hard and tinny effect (R. p. 180). This piece was *not* swabbed with neat's-foot oil, and the test is rendered valueless by the doctor's own testimony on p. 182 of the record, where, calling attention to the fact that plaintiff's illustrative exhibit 14 (which had been dyed by him and then *swabbed with neat's-foot oil*) was soft and flexible, he stated:

> You will note when you come to examine these that it is not tinny. *That is solely due to the oil.* [Italics added.]

Here we have the doctor admitting that a piece of skin which had been dyed by him, and, according to his theory, dressed as well, would have exhibited tinniness but for the fact that he had swabbed it with neat's-foot oil, which he omitted to do to the piece of exhibit 1 that he tested.

From the foregoing it will be seen that all three of the tests so far detailed upon which Dr. Wilson based his conclusion that the skins in issue were not dressed have been shown to be inconclusive or valueless.

Dr. Wilson's testimony regarding the atomic structure of the skin (R. pp. 186–192) is set forth at length in the opinion of the majority. I have carefully examined the doctor's testimony and fail to find that it can be regarded as supporting plaintiff's position in this case.

According to Dr. Wilson, when a dresser of skins treats them with alum, alum sulphate, or chrome alum, or with any material *commonly known as a tanning agent*, that material builds up the links between the chains of atoms and *strong* links replace the weak links (R. p. 191).

Transferring this picture to the use of processes that have been testified were used in the dyeing of skins such as exhibit 1, the doctor on direct examination testified that when the skin is treated with Ursol dye and hydrogen peroxide, either with or without a mordant, the hydrogen peroxide takes hydrogen away from some of the amino groups, leaving the nitrogen, and nitrogen links are formed between the chains. He stated that there is no proof of any action of the Ursol D, alone, to produce *strong* links in the protein chain, but that the hydrogen peroxide has the effect of making a linkage three times as *long* as the weak link it replaces, so that the protein is able to swell a considerable distance without a rupture (R. p. 193).

Note, therefore, that there is no substitution of *strong* links as is the case when *commonly known tanning materials* are used, but there

is a substitution of *long* links when Ursol D and hydrogen peroxide are used. If the doctor's original explanation of the atomic structure of the skin and the effect of dressing the same is correct, that is to say, strong links replace weak links, then skins such as those at bar are not dressed by treatment with Ursol D and hydrogen peroxide for there is no such replacement. Perhaps this is the reason he evaded direct answer to the question with reference to the effect of Ursol D and hydrogen peroxide on the skin.

And is this tanning the skin?

by responding

This is rendering it *less* subject to putrefaction and *less* subject to the harmful effect of hot water (R. p. 193.) [Italics added]

This is a far cry from his original statement that the primary purpose of dressing a skin is "to render it imputrescible, and so that it will dry out flexible after being wet." It would seem, therefore, that by the doctor's own standards treatment with Ursol D and hydrogen peroxide would not dress the skins at bar.

On direct examination Dr. Wilson named the material which was formed when a skin was treated with Ursol D and hydrogen peroxide as bis-diaminophenyl, para phenylene diamine (R. p. 192), and on cross-examination he stated this was known as "Bandrowski's base" and is reported in Hackh's Chemical Dictionary (R. p. 216). Reference to the 2nd edition (1937) of that work gives the formula and states that it is "used in organic synthesis." It is, according to the doctor, a "recognized tanning agent" (R. p. 216), although nowhere else do we find this statement made. He stated that Bandrowski's base would not be used *practically* as a tanning agent because it is too expensive (R. p. 217), and the witness Jacob Berson testified that in all of his experience in the fur dressing industry he had never known of Bandrowski's base being used in the dressing of skins (R. p. 653).

The inference to be drawn from the doctor's testimony that Bandrowski's base dressed as well as dyed skins such as exhibit 1 when Ursol D, an aniline intermediate, and hydrogen peroxide were used, is considerably impaired by the following testimony given by him:

X Q. * * *. Isn't it a fact that fur dressers, whenever they use aniline intermediates in their dyeing operations, first dress the skins by some other means? Isn't that the general practice?—A. That is a widespread practice.

X Q. So that in using aniline intermediates they are using them for dyeing, isn't that their purpose?—A. *Where the skin has been previously dressed the dye is used for dyeing purposes.* (Italics added.) (R. p. 858.)

From this it follows that the use of Ursol D and hydrogen peroxide on skins such as exhibit 1 *would not necessarily establish that the skins had been dressed thereby, unless it was first established that the skin had not been dressed prior to the application of the dyestuffs.*

Furthermore, no proof has been offered by the plantiff that sufficient Bandrowski's base to dress the skins would be produced by the amount of Ursol D and hydrogen peroxide used in the dye baths when goatskins such as exhibit 1 were dyed commercially, or that sufficient time was allowed to permit it to exert a dressing action on the skins, it appearing that the skins were immersed in such bath for ½ to 2 hours only.

After stating that he had heard the testimony of the witness Goorevich, who described the process to which he subjected skins such as exhibit 1 in China, Dr. Wilson gave his opinion that the fermentation of flour would have no tanning effect on the skin. It would, he said, form an alcohol and acetic acid, and that, together with the salt, would produce a pickling operation, which, he said, is a preservative. That would mean that the skin in the raw state could be kept a longer time in a better state of preservation, he said, but it would not tan or dress and had no effect on the molecular arrangement of the fibers in the goatskins (R. p. 202).

The majority has quoted from the work "Fur Dressing and Fur Dyeing" by William E. Austin (D. Van Nostrand Co., 1922) in connection with Dr. Wilson's testimony, but has neglected to quote the following, which occurs immediately after the part quoted in the majority opinion:

> The most important tanning processes employed for furs are the following:
> 1. Salt-acid tan, *or pickle.*
> 2. Mineral tans.
> 3. Chamois tan.
> 4. Formaldehyde and similar tans.
> 5. Combination tans.
> 6. Vegetable tan.

Under the caption "Salt-Acid Tan, or Pickle" Austin says, in part as follows:

> This is one of the most extensively used methods for tanning furs, and is also very cheap and easily applied. A typical formula for this tan is the following: A solution of salt is prepared containing about 10% of common salt, sodium chloride, and to this is added ½–¾ ounce of sulphuric acid for each gallon of tanning liquor. The proportions may be varied within certain limits, but the figures here given are those which have proven successful in practice. The solution should be made in a wooden or earthenware container, free from any metal, as it would be attacked by the acid. The liquor is then applied to the flesh-side of the fleshed skins by means of a brush, making sure to touch all parts of the pelt. They are then placed in a pile and allowed to remain thus until tanned, an operation which occupies a time ranging from a few hours to two or three days depending on the thickness of the skins. When the corium has lost its translucense and has become a milky-white color throughout the entire thickness of the skin, as can be seen by viewing a cross-section, the skin may be considered tanned. In some instances, where the hair of the fur can stand immersion without injury, the skins are entered into the pickling solution and allowed to remain for 12 to 24 hours, which is generally a sufficient time to tan them in this manner.

The acid of the pickle causes the skin to swell, the salt then penetrating between the fibres of the corium, and at the same time reducing the swelling of the skin. The acid also neutralizes the alkaline products of decomposition which may form, while the salt acts as a deterrent to the progress of the putrefactive processes. When the skin is dried after tanning, and stretched and finished, a soft white leather is obtained which is permanent as long as it is kept dry. It is the salt which causes the fibres of the skin to be completely differentiated and thus prevents their adhesion.

It is interesting to note that other acids besides sulphuric can be used for the pickle, organic as well as mineral, formic acid in $\frac{1}{4}\%$ solution being especially effective and giving excellent results, but is more expensive than the mineral acid. A method, which in principle is identical with the pickle, but carried out in an entirely different manner, is the lactic acid fermentation process, or "Schrotbeize" as it is called in German. * * * . A somewhat modified form of this process is the so-called Russian tan, which is usually done in the following manner: 5 parts of bruised barley grains are mixed with ten parts of luke-warm water in a vat, which is then covered up. A small quantity of brewers' yeast is also added to aid in the fermentation. As soon as the mixture develops a slight heat, one part of fresh whey is added, and the fleshed skins entered into the tanning liquor in which they remain for about 12 hours. They are then tramped in the mixture so as to effect greater penetration, and left until the tanning process is complete.

*     *     *     *     *     *     *

The lactic acid fermentation processes have an advantage over the pickle, in that the slow formation of weak organic acids with their gradual action produce a softer leather, with a gentler feel, the presence of the flour and the grains of the tan, aside from their tanning action, contributing to the fullness and softness of the leather. There is also less likelihood of the leather being subsequently affected by the presence of the acid in it, as lactic and acetic acids are much less injurious than sulphuric acid to leather.

*     *     *     *     *     *     *

In Austria, Russia, and to a certain extent in Germany also, the "Schrot-beize" is still considerably employed, chiefly for dressing sheep and lamb skins. The dressing of the various kinds of Persian lambs, caraculs, astrachans, etc., in the native center of the industry in Buchara and surrounding districts, is also a "Schrot-beize," barley, rice flour or rye flour, and salt water being used to prepare the skins, the manipulations being essentially the same as those described above, although carried out in cruder and more primitive fashion.

The similarity between the processes described and the process to which the skins at bar were subjected in China is at once apparent, as is also the fact that the Chinese process is merely a variant thereof. What is most important, however, is that an authority on fur dressing and dyeing regards pickling and its variations as dressing processes.

Much light is thrown on Dr. Wilson's opinion that pickling is not a dressing process by reference to his work "The Chemistry of Leather Manufacture" published in 1929 (The Chemical Catalogue Co.), and particularly to page 952 thereof, where, under the heading "Pickling and Tanning," he states:

Fur dressers often refer to pickling as a tanning process, although it is apparent

*to the leather chemist* that sulfuric acid and common salt do not convert collagen into leather. [Italics added.]

From this and his testimony it would appear that Dr. Wilson, in giving his opinion as to the goatskins in issue, was dealing only in terms of leather chemistry and not in terms of the fur dresser.

It is particularly noteworthy that in vol. II, ch. 35, of his book, at the beginning of the chapter headed "Furs," Dr. Wilson took occasion to say:

In compiling the material for this chapter, the author has had the *very able assistance* of Mr. William E. Austin, author of Fur Dressing and Fur Dyeing \* \* \*. [Italics added.]

During his cross-examination Dr. Wilson testified:

X Q. Are you familiar with the statements of Austin to the effect that a pickle—wherein Austin's "Fur Dressing and Fur Dyeing," as to a pickle—wherein flour when fermented is a tanning agent?—A. I have, and I disagree with him.

X Q. You disagree with him?—A. Very much so. (R. p. 224.)

It is apparent, therefore, that Dr. Wilson, while agreeing that the process to which the skins in issue were subjected in China was a fermentation process of pickling such as Austin described, nevertheless disagreed that such process could be considered a dressing process. Thus his opinions, given obviously from the leather chemist's standpoint, contrast with Mr. Austin's, to whom he pays tribute, *and who stands as an authority on the subject which forms the heart of this case, namely, fur dressing.*

On behalf of the defendant, Jacob Berson (R. pp. 612–695) testified that he is a fur dyer and research chemist in fur dyeing, and that after graduation from Columbia University in 1917 with the degree of Chemical Engineer he did analytical and research work in the field of chemistry until 1919, from which time he has been engaged in the development and manufacture of fur dyes and in the business of fur dyeing. He was, at the time of his testimony, vice president of the Technical Association of the Fur Industry. During the time he was engaged in the development and manufacture of fur dyes he did much research work in connection with Ursol dyes, and in connection with his work he had to make a thorough study of dressing processes, and to that end went through the dressing processes of every kind used by the firm with which he was connected (R. pp. 612–621, 629–630).

In his opinion "the primary purpose of dressing a fur skin is to convert the raw skin into one which dries out soft and pliable, even after being wet, and that is fit for use" (R. p. 622). Upon examining exhibit 1–B he stated that in his opinion it was a dressed skin (R. p. 631).

He testified that he had become acquainted with the practical methods used in the fur dressing and dyeing industry to distinguish a raw from a dressed skin, and he stated that he had subjected por-

tions of exhibit 1 to such tests. He took a portion of exhibit 1–A–3 and applied tap water to the pelt side of the skin and left it to dry in the open air at room temperature. He found that it dried out just as soft and pliable as it had been before, having the same feeling and appearance as it had before being subjected to the test, which is known as "wetting back" (R. pp. 632–633). The portion tested was received in evidence as defendant's exhibit 1–A–4.

He subjected a portion of exhibit 7, a raw skin, to the same test and found that it dried out hard and horny (R. p. 633). This portion was received in evidence as defendant's exhibit 7–A.

Another test was made by soaking a portion of exhibit 1–A in tap water for 24 hours, squeezing it, and leaving it to dry in the open air at room temperature. This portion, which is in evidence as exhibit 1–A–5, dried out soft and pliable. The same test applied to a portion of exhibit 7 resulted in exhibit 7–B, which was hard and horny (R. pp. 634–635).

Another portion of exhibit 1–A was soaked in water for 48 hours, removed from the water, folded over on itself, squeezed as hard as possible with the hands, and opened up. On the crease made by the fold there was a white line, which indicated to the witness that the skin had been dressed (R. p. 640). He stated that he had seen practical dressers "any number of times" test skins in that way for the purpose of determining whether skins, as they came out of the dressing solution, "were finished dressing, whether they were not raw any more." This portion was received in evidence as exhibit 1–A–6 (R. p. 645).

During his rebuttal testimony Dr. Wilson stated that the foregoing test was no indication of dressing but only an indication that the fibers had been separated sufficiently to allow air spaces to exist between them; yet he admitted that he had made that test thousands of times in connection with the manufacture of furs from sheepskins or lamb-skins and in fur dressing plants, tanneries, and other plants (R. p. 826). A pertinent inquiry would be why such a test would be made in such places if not in connection with dressing or tanning.

A similar test performed on a portion of exhibit 7, a raw skin, failed to show the white line (R. p. 637).

When a résumé of the processes through which witnesses Emrich, Haack, and Weinstein put skins such as exhibit 1 was read to Mr. Berson, he stated that they consisted of dyeing processes, and also stated that fur dressing and fur dyeing are separate and individual processes (R. pp. 658–659).

On cross-examination the witness enumerated the processes involved in dressing a skin as used in the United States as follows:

(1) Soaking the skin in cold water overnight.
(2) Drumming it for a few minutes and then fleshing it.

(3) Soaking it again to get it permeable and then placing it in the dressing solution.

(4) Drumming it in sawdust until nearly dry.

(5) Greasing, either by hand or in a kicker.

(6) Drumming in sawdust to remove extra grease, and caging to remove the sawdust.

(7) Stretching it.

(8) Drumming and caging it again.   (R. pp. 671–672.)

It is, I think, highly illuminating to compare, side by side, the processes through which the skins in issue were subjected in China, and the standard American dressing process as outlined by witness Berson, which testimony is uncontradicted. As shedding further light on the subject and the rationality of previous decisions thereon, I also include the processes through which the witnesses in the *Rotberg & Krieger* case, *infra*, testified the dogskins there in issue had been subjected in China. I have selected the *Rotberg & Krieger* case for the reason that it is the parent case on the subject under the Tariff Act of 1930. For convenience the corresponding operations have been placed side by side.

| *Rotberg & Krieger Record* | *Present Record* | *American Dressing Process* |
| --- | --- | --- |
|  | 1. Soaked in water | 1. Soaked in water |
| 1. Fleshed | 2. Fleshed | 2. Drummed and fleshed |
| 2. Dried in sun . |  |  |
| 3. Placed in flour and water solution | 3. Placed in flour, salt and water solution | 3. Placed in dressing solution |
| 4. Dried in sun | 4. Dried in sun | 4. Drummed in sawdust until nearly dry |
|  |  | 5. Greased |
|  |  | 6. Excess grease removed |
|  | 5. Dampened, then staked or stretched and scraped | 7. Stretched by machine |
|  | 6. Beaten | 8. Drummed and caged |

From the foregoing it will be seen that every operation in the American dressing process has its counterpart in the Chinese process, save that the greasing and removal of the excess grease were not done in the latter process. When it is borne in mind that the greasing operation is for the purpose of softening the pelt, and an examination of exhibits 1–A and 1–B discloses that they are soft and flexible, it must be concluded that its elimination from the Chinese process rendered the latter nonetheless a dressing process. It is noted that in witness Olson's description of the combination "dressing and dyeing" process through which he put skins such as are here involved, no greasing of the skins was mentioned, nor was any greasing done by those who dyed such skins with Ursol D and hydrogen peroxide, which, under Dr. Wilson's theory, dressed the skins.

It is pointed out by the majority that in describing an American dressing process witness Berson did not mention the use of a solution of salt water and flour. I am satisfied from the record that such solution was a dressing solution after fermentation took place, and

that it operated as a pickle. This statement is borne out by Dr. Wilson's testimony, and although he refused, from the standpoint of a leather chemist, to recognize pickling as a tanning or dressing process, nevertheless, at least one recognized *fur* authority, Austin— to whom Dr. Wilson pays tribute in his book—classes pickling among the "most important tanning processes employed for furs" (Austin, op. cit., ch. V).

Turning now to a consideration of the verb "dress" as defined by lexicographers, it is to be noted that, as applied to fur skins, it does not receive very precise treatment. The majority, after quoting the Standard and Century dictionaries proceeds to the decision of the Circuit Court of Appeals, First Circuit, in the case of *United States* v. *Wotton*, 53 Fed. Rep. 344, wherein, while discussing the scope of the term, "furs, dressed on the skin" as used in paragraph 444 of the Tariff Act of 1890, it was said, *inter alia:*

That such dressing means curing and leathering the pelt is plain, and these are "furs dressed on the skin."

The majority has pursued the matter further and quoted Webster's New International Dictionary for the term "leathering" as follows:

Act of forming, applying, or furnishing with leather; * * *.

Still further investigation in the same authority reveals that the term "leather" is defined therein as follows:

The skin of an animal, or some part of such skin, tanned, tawed, *or otherwise dressed for use,* to render it resistant to putrefaction and relatively soft and flexible when dry * * *. [Italics added.]

Although not expressly stated in the opinion, the majority seems to have tied "leathering" to "tanning" and to have adopted as the test for leathering or tanning the method by which the result is accomplished. As it at once appears from the foregoing definition of the term "leather," the method of arriving at the result may vary but the criteria are resistance to putrefaction and relative softness and flexibility when dry. Plaintiff has introduced no evidence which has not been clearly rebutted to show that the skins at bar have not been rendered resistant to putrefaction and relatively soft and flexible when dry. A mere examination of exhibit 1 is convincing on both points.

I see nothing in the decision in the *Wotton* case which excludes the goatskins at bar from the category of dressed furs when the terms used in that decision are understood in their common meaning. No one appears to deny the fact that skins which are intended for fur purposes are treated, so far as leathering is concerned, in a different manner than skins intended for leather purposes. In this connection I note the majority has quoted from chapter V, of Mr. Austin's book, where, after referring to the definition of Fahrion of leather as

* * * animal skin, which on soaking in water and subsequent drying does not become hard and tinny, but remains soft and flexible; which does not decay in

the presence of cold water; and which does not yield any gelatine on boiling with water,

the author goes on significantly to say

> While the requirements set forth in this statement are essential for leather, and a compliance with them would also be desirable for tanned furs, a somewhat less rigorous standard of conditions to fulfill is satisfactory for the general needs and purposes of furs. The chief qualities which tanned furs must possess, with particular reference to the leather side of the pelt, are retention of softness and flexibility after being moistened by the furrier for manufacturing purposes, and subsequent drying; and freedom from a tendency to decay during this operation and thereafter. If the furs are to be dyed, the effect of the dyeing must also be considered, and the tanning must be such as to enable the dyed furs to possess the above qualities.

On the same subject, Max Bachrach, in his treatise entitled "Fur" (Prentice Hall, Inc., 1937), has the following to say under the caption "Dressing" at page 571:

> Soon after peltries are removed from the animal, they are either dried or salted, and in either state they will keep for a great length of time, provided the surrounding temperature is cool enough and the drying has been properly done.
>
> Before these peltries can be manufactured into garments, however, it is necessary to preserve the skin to insure its permanency. When the skin is used for leather purposes only, the transformation process is known as *tanning*, and during this process the hair is removed and not given as much consideration as the skin. In fact, more thought is given to the type of leather desired, whether stiff and inflexible, or soft and spongy. The hair is only a by-product. But in the Fur Trade, where the hair is of prime importance and utility and appearance must both be considered, the transformation process is known as dressing.
>
> Dressing, therefore, is essentially a process that preserves the skin in a flexible state and cleanses as well as improves the hair to make it lustrous and beautiful.

Dressing of furs, according to both Austin and Bachrach, appears to be divided into four operations—(1) preliminary operations such as soaking and fleshing, (2) tanning, or converting the pelt side of the skin into leather of more or less permanency, (3) drying, and (4) finishing, including greasing or oiling, stretching, beating, or drumming and caging, to clean the skins. The evidence as to the processes to which the skins in issue were subjected in China indicates that they received each of the four operations detailed above, save the greasing or oiling, and it has already been pointed out that such greasing or oiling was evidently considered unnecessary with regard to the skins at bar.

The testimonial evidence offered herein has been reviewed in some detail in the majority and this opinion. In my view the overwhelming preponderance in weight thereof establishes that the skins at bar were, in their imported condition, known, bought, sold, and handled as dressed skins, and that they were, in fact, dressed within the common and commercial meaning of that term.

This conclusion is strongly supported by the real evidence offered at the trial in the form of exhibits 1-A and 1-B, which are stipulated

to be goatskins representative of the merchandise in issue. Examination of these silent but potent witnesses shows them to possess the characteristics, so far as can be determined by mere physical inspection, of dressed fur skins. The leather side of the skin has a leathery feel and appearance; it is soft and flexible, has the white color described by Austin characteristic of leather produced by the pickling process, and there is not the slightest sign of putrefaction.

Consideration of the entire record impels to the conclusion that goatskins such as those before us are comparatively cheap furs intended for use on inexpensive garments, and hence it is logical that they would be dressed as economically as possible. For this reason, it is probable that the dressing which the skins received in China was not as good or as thorough as American dressers might give to such skins, but it was nevertheless a dressing process and fitted the skins for their ultimate use. The difference between the Chinese dressing process and the American dressing process is one of degree and not of substance.

Further support for this conclusion is found in the description on the consular invoice. This reads, "1 bale containing 253 Grey goat skins Tanned." I appreciate that this statement has no probative value standing alone, but as corroborative of the conclusion reached by me it is worthy of note.

There remains only to be considered the effect of previous decisions on the same subject by this and our appellate tribunal. I have carefully examined the history of the litigation on the subject of goatskins, dogskins, and dressed furs as far back as *Allum* v. *United States*, 4 Ct. Cust. Appls. 332, T. D. 33526, and particularly those cases which arose under the Tariff Act of 1930, namely, *Rotberg & Krieger* v. *United States*, T. D. 48068, affirmed on appeal in *United States* v. *Rotberg & Krieger*, 24 C. C. P. A. 441, T. D. 48902, and *Arnhold & Co., Inc., et al.* v. *United States*, 1 Cust. Ct. 170, C. D. 44, affirmed on appeal in *United States* v. *Arnhold & Co., Inc., et al.*, 27 C. C. P. A. 135, C. A. D. 74, both of which are cited and quoted in the majority opinion, and *S. M. Brachman i& Co. et al.* v. *United States*, 5 Cust. Ct. 153, C. D. 389.

Having in mind these decisions, I assert candidly that I find no fault and make no criticism thereof, since it appears that in each case there was a conflict of evidence which was resolved by the court in accordance with its determination of the preponderance in weight thereof, and, of course, as a matter of law, the Court of Customs and Patent Appeals indicated that, according to the established rule, it would not reverse a finding of fact by the trial court unless it appeared to be clearly against the weight of the evidence. However, the decision in each of the cases referred to, holding the skins involved were not dressed, is confined to the merchandise and record therein. They are

therefore not controlling of the issue herein, and I am satisfied that my conclusion that the skins at bar were, in their imported condition, dressed, is compelled by the record before us.

Judgment should issue overruling the protest in all respects.